[Crim. No. 238.   Third Appellate District.—February 23, 1914.]

THE PEOPLE, Respondent, v. CLARENCE A. KELLEY, Appellant.

CRIMINAL LAW—HOMICIDE—INSTRUCTION AS TO INVOLUNTARY. MAN-SLAUGHTER NOT BASED ON EVIDENCE.—Where a watchman, on awakening from sleep, intentionally shot a man whom he saw approaching him, and in a prosecution for the homicide sets up the right of self-defense, the court commits a vital error against the rights of the accused in instructing the jury upon the question of involuntary manslaughter, of which crime he is convicted.

ID.—INSTRUCTIONS—NECESSITY OF THEIR BEING APPLICABLE TO CASE IN HAND.—The fact that a valid conviction of manslaughter may be had under an indictment for murder does not justify any kind of a charge which a court may give upon that subject, regardless of the character and the theory of the case; instructions must be applicable to the facts and features of the case in hand.

ID.—INVOLUNTARY MANSLAUGHTER—HOW DISTINGUISHED FROM MURDER AND VOLUNTARY MANSLAUGHTER.—The crime of involuntary manslaughter is entirely distinct from that of murder and voluntary manslaughter. The three crimes possess but one element in common, and that is the fact of the killing. In murder there is, essentially,

the element of malice or premeditation and the preconceived intention to kill. In voluntary manslaughter, while the element of malice or premeditation in the taking of life is wanting, the intention to do so is present, as the term "voluntary" necessarily implies. Involuntary manslaughter, as the phrase necessarily imports and as our code defines that crime, is the taking of life in certain unlawful ways without any intention of doing so.

APPEAL from a judgment of the Superior Court of Humboldt County and from an order refusing a new trial. Geo. D. Murray, Judge.

The facts are stated in the opinion of the court.

G. W. Hunter, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—Under an information duly filed in the superior court of Humboldt County charging him with the crime of murder, the defendant was found guilty by the jury of the crime of involuntary manslaughter, and this court is asked to review the record and set aside the verdict for alleged errors of the trial court, presented here on an appeal from the judgment of conviction and the order denying the defendant a new trial.

The facts as disclosed by the record are these: At about the hour of two o'clock on the morning of May 22, 1913, the defendant shot and killed one Edward B. Schnaubelt, the homicide having occurred in the northern part of Humboldt County on property belonging to the Lagoon Lumber Company. Said company acquired said property by deed, dated December 28, 1910, from the Humboldt Shingle Company, the latter company having for many years prior to said transfer of the property maintained and operated a shingle mill thereon. While the property was owned by the last named company, the deceased was, for many years, superintendent of the shingle mill, and, with his family, resided on the premises. The deceased was finally compelled to surrender possession of and remove from the premises, but, claiming an interest in said mill and certain personal property situated on

the premises, he subsequently returned and again took possession of the property. Thereafter—either in the month of September or October, 1912—he was again deprived of possession and evicted from the premises by appropriate legal proceedings. At about this time, the Lagoon Lumber Company placed the defendant and one Hevener in charge of the premises, their duties being to watch the same and so prevent the wrongful taking of any of the personal property situated thereon. Kelley remained on the premises in that capacity continuously up to the time of the homicide, with the exception of a few weeks, during which time he was in a hospital, where he was required to go and remain on account of illness. Hevener was succeeded by a man named Deiser, the latter by one Bridges, and finally one Henry Hanson was installed in the place of Bridges and remained as an assistant of the defendant up to the day on which the shooting occurred, he having witnessed that act.

Early in the month of May, 1913, the Lagoon Lumber Company sold the machinery in the shingle mill and all the personal property on the premises to one J. F. Helms, who, shortly thereafter, sold the property so purchased to the firm of Larsen & Bell. After Kelley was placed in charge of the premises, it appears that therefrom various articles of personal property were, from time to time, surreptitiously taken or removed. Most of the property so taken was removed from the shingle mill and the blacksmith shop. Kelley and Hanson, up to the twentieth day of May, had been sleeping in a cabin which was situated on the premises at a distance, approximately, of five hundred yards from the blacksmith shop and of almost six hundred yards from the mill. Reasons existed for suspecting that the deceased and his sons —young boys, of the ages of eleven and thirteen at the time of the homicide—had made a practice of visiting the premises at late hours of the night or the early morning hours, and taking with them from the mill and blacksmith shop such articles as they claimed belonged to the deceased. In fact, the evidence discloses that Kelley and Hanson knew of certain property having been taken from the premises by the deceased.

In the month of May, 1913, Larsen & Bell commenced the dismantling of the mill for the purpose of removing the ma-

chinery thereof from the premises. Having been apprised of the taking of certain parts of the machinery and other personal property from the premises, Larsen, a few days before the shooting, admonished and requested Kelley and Hanson to keep stricter vigil or watchfulness than they had theretofore maintained and thus prevent persons from coming on the premises during the night-time and removing therefrom any property. In obedience to the admonition so given, Kelley and Hanson, on the twentieth day of May, moved their bed from the cabin which they had been occupying as a sleeping apartment out in the open and upon the ground, at a point between and about equal distance from the shingle mill and the blacksmith shop.

Kelley had had some trouble with Schnaubelt and his sons over the trespassing of the stock of the deceased upon the premises upon which the mill was located. He had also had some controversy with the deceased over the taking by the latter of certain property from said premises, both Larsen & Bell and the former claiming to be the owner thereof. During the course of the controversy referred to, Kelley requested Schnaubelt to keep away from the premises and declared that he (Kelley) had been placed in charge of the property to keep him (deceased) away. The latter rejoined by saying that he well knew for what purpose Kelley had been put in control of the property and remarked that other watchmen had previously been placed there for the same purpose but that they did not remain there long.

Kelley had also been told by other persons that the deceased was a "dangerous man"; that he was "an anarchist and a bomb thrower," and that he had said that he would "get those fellows," referring to Kelley and Hanson. It further appears that Kelley was aware of trouble which the deceased had had with Deiser, who served as watchman at the premises at one time, and in the course of which the deceased took a shotgun from the possession of Deiser and carried it to his (the deceased's) home.

Kelley and Hanson together occupied the bed which, as above explained, was placed out in the open and upon the ground. Kelley remained awake most of the night beginning with the twentieth day of May, but nothing out of the ordinary happened or occurred on the premises during that

night. On the following night—May 21, 1913—Kelley and Hanson retired at about eight o'clock P. M., the former placing a Smith & Wesson 38-caliber revolver under his pillow. The moon was out that night, and, although an ocean fog, hanging high above the earth, prevailed, a person with ordinary eyesight could easily recognize an acquaintance a short distance from him. Shortly after retiring on the night last mentioned, both Kelley and Hanson fell into a sleep and so remained until at about the hour of two o'clock the following morning— May 22nd—when Kelley was suddenly awakened by a noise which, according to his description of it, sounded like that produced by one stumbling against some object. Upon opening his eyes, he saw the deceased approaching and then within twelve feet of his bed. He at once recognized Schnaubelt, and he thereupon uttered a loud scream and at the same instant reached for and procured his revolver and began shooting at the deceased. He emptied four shells in firing at Schnaubelt. But one of the shots took effect in the body of the deceased, the bullet entering just below the collar bone, and taking a downward course, severing the artery leading to the heart, and lodging in the shoulder by the side of the back-bone, just under the spine. The wound thus inflicted produced almost the instant death of Schnaubelt.

Hanson testified that he was awakened by the loud, shrill outcry sent out by Kelley and the shot which was fired almost instantaneously therewith. After Kelley had fired at the deceased two or three times, Hanson grabbed the former by the arm and urged him to cease shooting.

Kelley declared that the scream uttered by him, on awakening and seeing the deceased coming toward his bed, was occasioned by fright; that, having been told of the dangerous character of the deceased, he believed that the latter was approaching his bed for the purpose and with the intention of inflicting upon him bodily injury and that it was under the influence of the fear so entertained that he fired at the deceased, believing in good faith that it was necessary to shoot the deceased to protect himself against violence at his hands.

The foregoing involves an accurate statement, in substance, of all the facts and circumstances leading to and immediately attending the killing, and upon which the jury predicated their verdict.

The defendant here claims that the judgment and the order should be reversed for errors alleged to have been committed by the trial court in its rulings respecting matters of evidence and in reading to the jury certain instructions, numerous errors being assigned under both those heads. But we are convinced that the court committed a vital error against the rights of the accused in instructing the jury upon the question of involuntary manslaughter, of which crime the defendant was convicted, and it will not be necessary, therefore, to consider any other point urged by the defendant in impeachment of the judgment and the order than that involved in the action of the court in so instructing the jury.

The instruction referred to reads as follows: "Within the crime of murder is included the crime of involuntary manslaughter. If one person unlawfully kill another person without malice, and while in the commission of a lawful act, which might produce death in an unlawful manner, or without due caution and circumspection, it is involuntary manslaughter. If, therefore, you find from the evidence beyond a reasonable doubt that, at the time and place mentioned in the information, the defendant, while guarding property with a loaded revolver, willfully and without due caution and circumspection, shot and killed the said Schnaubelt, then the defendant would be guilty of the crime of involuntary manslaughter, even though said killing was without malice."

Upon concluding the reading of this charge, the court submitted to the jury, among others applicable to the charge of murder, a form of verdict conforming to the purport of the foregoing instruction, and, as seen, the result arrived at by the jury required the adoption of that form.

By section 192 of the Penal Code, manslaughter is declared to be the unlawful killing of a human being without malice, and is divided into two kinds, viz., "1. Voluntary—upon a sudden quarrel or heat of passion. 2. Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."

Thus it is to be observed that, to justify the giving of the instruction above quoted, there must have been some evidence which showed or tended to show either that the homicide was the result of the commission by the defendant of some un-

lawful act, not amounting to felony—as, for instance, a violent battery which was the indirect cause of the death of the deceased—or that death was caused by the unlawful manner of doing some lawful act, which might produce death, or by the execution of such lawful act without due caution and circumspection—as, for instance, causing the death of a person by the use or handling of a loaded gun with a degree of carelessness amounting to criminal negligence.

As has been shown, there is absolutely no element of involuntary manslaughter disclosed by the evidence in this case. In other words, there is not revealed by the evidence any fact or circumstance even remotely tending to establish against the defendant a case of involuntary manslaughter. The evidence, upon its face, without conflict shows these facts: That the defendant was placed as a watchman in charge of the premises upon which the shooting occurred for the express purpose of keeping the deceased away from said premises or at least of preventing him from taking therefrom, as he was suspected of having done on some occasions, personal property of which the defendant's employers claimed ownership; that the deceased knew that the defendant had been placed in control of the property for that purpose; that the defendant believed, from statements made to him by other people touching the reputation and the character of the deceased, that the latter was a "dangerous man"—that is to say, a man who would not hesitate to resort to violence if necessary to carry out his set purposes, of which an intention to obtain custody of certain personal property on the premises, under a claim of ownership thereof, was shown to be one.

The record further shows that the defendant declared and admitted on the witness-stand, and his testimony was not controverted in that particular, that he deliberately fired at the deceased, under the belief and the fear that the latter was approaching his bed for the purpose and with the intention of inflicting upon him bodily injury. In a word, the defendant made no claim that the killing was even the result of a sudden quarrel or committed in the heat of passion, much less that it was the result of an unlawful act not amounting to a felony or the consequence of misadventure. Nor did the prosecution make any such claim, so far as the record discloses, and, as stated, no such theory finds the slightest support in the evi-

dence. The defense interposed by the defendant was that of self-defense, his sole claim being that all the circumstances of which he was cognizant and by which he was surrounded at the time of the shooting were such as to afford to him reasonable ground to apprehend a design in the deceased to do him great bodily injury, and that there was, when he fired, "imminent danger of such design being accomplished" (Pen. Code, sec. 197, subd. 3) ; that the circumstances referred to were "sufficient to excite the fears of a reasonable person," and that, in firing at the deceased, he "acted under the influence of such fears alone." (Pen. Code, sec. 198.) It follows that an instruction upon the subject of involuntary manslaughter is not only foreign to the theory upon which the cause was tried but wholly inapplicable to the evidence or any fact or circumstance developed thereby.

That the action of the court in giving to the jury the above quoted instruction upon that subject and in submitting to them a form of verdict conforming thereto was, under the circumstances of this case, prejudicial, we think is plainly manifest.

Strictly speaking, there was but one or the other of two results which, under the evidence, could logically have been reached by the jury, and that was to convict the defendant of one or the other of the two degrees of murder or acquit him. This is not to say, however, that a verdict of voluntary manslaughter could not be sustained upon the record before us; for it is true, as a general proposition, which might, perhaps, be held applicable in this case had the defendant been convicted of voluntary manslaughter, that a party will not be heard in an objection to a verdict of manslaughter against him under an indictment for murder where it appears that, under the evidence, he in justness ought to have been convicted of the crime of murder of one or the other of the degrees thereof, the theory of that proposition being that there can in reason be no just cause of complaint by the defendant where the verdict is more favorable to him than is perhaps justified by the evidence. (*People* v. *Barnhart,* 59 Cal. 381; *People* v. *Maroney,* 109 Cal. 277, [41 Pac. 1097] ; *People* v. *Lowen,* 109 Cal. 381, [42 Pac. 32] ; *People* v. *Muhlner,* 115 Cal. 302, 306, [47 Pac. 128].) But it is very clear that this case does not fall within the proposition declared in those cases. The fact

that a valid conviction of manslaughter may be had under an indictment for murder "does not justify any kind of a charge which a court may give upon that subject, regardless of the character and the theory of the case; instructions must be applicable to the facts and features of the case in hand." (*People* v. *Huntington*, 138 Cal. 261, 264, [70 Pac. 284].) As we have shown, this case is entirely destitute of any element of involuntary manslaughter, and the instruction under consideration was as inapplicable to it or any of its features or to any theory deducible from the evidence as an instruction upon highway robbery would have been, and it manifestly led to a verdict which not only derives absolutely no support from the evidence but which is equivalent to the acquittal of the defendant of the higher crimes embraced in that charged in the information. (*People* v. *Mulhner*, 115 Cal. 303, [47 Pac. 128] ; *People* v. *Cyty*, 11 Cal. App. 702, 706, [106 Pac. 259].) In other words, the verdict returned is not only without any foundation in the evidence for its support, but its effect is to acquit the accused of any crime within that charged of which he could legally have been convicted under the evidence.

It is no argument going to the impeachment of the foregoing views to contend that but for the instruction under criticism the jury might have convicted the accused of some one of the other offenses included in the charge, and, therefore, he is now in no position to complain. The presumption arising from the verdict is the reverse.

The crime of involuntary manslaughter is entirely distinct from that of murder and voluntary manslaughter. The three crimes possess but one element in common, and that is the fact of the killing. In murder, there is, essentially, the element of malice or premeditation and the preconceived intention to kill. In voluntary manslaughter, while the element of malice or premeditation in the taking of life is wanting, the intention to do so is present, as the term, "voluntary," necessarily implies. Involuntary manslaughter, as the phrase necessarily imports and as our code defines that crime, is the taking of life in certain unlawful ways without any intention of doing so. These distinctions were made clear to the jury. Indeed, the jury were fully and clearly instructed upon the crime and degrees of murder and the lesser offenses included therein, and presumptively understood and were guided by

said instructions and the distinctions pointed out therein between the several offenses embraced within the crime of murder. The further presumption is to be indulged that, after deliberating upon and fully considering and testing the evidence by the instructions upon murder and voluntary manslaughter, the jury reached the conclusion that there was disclosed, outside of the fact of the killing, none of the essential elements of either the crime of murder or that of voluntary manslaughter, and that, thereupon, and solely influenced by and acting upon the instruction read to them by the court that, under the evidence, they were at liberty to find a verdict of involuntary manslaughter, found the defendant guilty of said offense, and that but for said instruction a verdict of not guilty of any offense would have been the result of the jury's deliberations.

We can see no escape from the conclusion that said instruction was without a just place in the case and that it was solely responsible for a verdict wholly destitute of a prop for its support.

The judgment and order are reversed.

Chipman, P. J., and Burnett, J., concurred.