[Crim. No. 1636. Second Appellate District, Division One.—July 5, 1928.]

THE PEOPLE, Respondent, v. CHARLES O. MOUNT, Appellant.

John A. Deweese and Josiah Coombs for Appellant.

U. S. Webb, Attorney-General, John L. Flynn, Deputy Attorney-General, and Warner I. Praul for Respondent.

HAHN, J., *pro tem.*—Appellant was charged by information filed by the district attorney of Los Angeles County with the crime of murder. From the judgment upon a verdict of guilty of manslaughter, and an order denying the defendant's motion for a new trial, this appeal is prosecuted.

Four assignments of error are stated, as follows:

First. "A dying declaration, or statement, was admitted in evidence contrary to law, and to the injury of this appellant; the said declaration is set forth on pages 69 and 70 of the reporter's transcript."

Second. "The statement made by the defendant, alleged to be a confession, as found on pages 33 to 70 of the reporter's transcript."

Third. "The court allowing testimony to be introduced as to instruments in Dr. Mount's Belvedere office a long time prior to the 15th of November, 1927, as found on pages 187

and 205 of the reporter's transcript, wherein the witness, Dr. J. J. Mortensen, testified, beginning on page 193, that in the fall of 1924 the defendant had instruments, and various instruments, that could be used to produce an abortion."

Fourth. "The fourth assignment of error relied upon by this appellant is the error in giving instructions, and the failure to give instructions, and the theory upon which this case was submitted to the jury; that is to say, that the defendant was charged with murder, or homicide."

While there is a sharp conflict in the evidence upon several material matters, there is sufficient evidence to have justified the jury in accepting the following as a fair story of the material events and circumstances relating to the case:

The deceased, Violet Van Tassel Berdue, was a young married woman of the age of twenty-five years. Early in October, 1927, she was taken ill with pains and dizzy spells. Attributing her suffering to the fact that she had passed her menstrual period, upon the advice of a woman friend, she consulted the defendant, who was a licensed chiropractic practitioner. After the defendant had made an examination of the patient and had listened to her story, he gave her an electric treatment and then inserted two instruments in her vagina. She was told to return on the following day, when again an instrument resembling a clippers was inserted into her vagina. Two days later, on October 17th, she was treated by the defendant in a similar manner with instruments. On this third occasion the defendant stated to the deceased: "You are in a pretty bad condition, but I can't make you come." He then inserted a tube into the patient's vagina, with instructions that it be kept there during the night. Some time during the night she began to flow. Several days later the patient called at the defendant's office, where she was treated by him, and shortly thereafter he visited her at her home, where she was confined to her bed, suffering from vomiting and nausea, and running a high fever and rapid pulse. She was then removed to the county hospital, where she was under the care of a regular physician, but, on November 6th, she was taken to the Angelus Hospital, where she was under the care of Dr. A. M. Hansen, a regular physician, until her death, which occurred on November 15th. At the Angelus Hospital she was given

three blood transfusions, and a portion of her uterus was removed. Upon examination of the uterus it was found to contain a portion of the after-birth and in a diseased condition. Dr. A. F. Wagner, who performed an autopsy, testified that death was due to "acute endocarditis with septicemia following abortion."

On November 10th, when apparently the patient's condition was regarded as very serious, and after she had on several occasions stated to the members of her family and the attending physician that she did not expect to recover, the deceased made what has been referred to in the record as a dying declaration, which reads as follows:

"State of California, County of Los Angeles, ss. Violet Van Tassel, being first duly sworn, deposes and says: That she is above the age of twenty-one years, a resident of 419 West 57th St., Los Angeles, Calif., and a competent witness. That on October 14th, 1927, at about 7 o'clock p. m. she went to the office of Dr. O. C. Mount at Avalon and Vernon Streets, Los Angeles, and the nurse there said, 'All right, come on in.' I said, 'I am the girl that Allie sent.' The nurse then put an electric pad on her stomach. Then Dr. Mount came in and said, 'All right, come on in here,' Then he put a spoon in me to open me up and then another instrument like a pair of clippers in me. That on October 15th, 1927, at about 9 o'clock a. m., affiant went again to the office of Dr. Mount and the nurse put a big light over me for about an hour and then she was taken into another room. The doctor said, '.Good morning, how do you feel.' Affiant said, 'Not very good.' Ede was with me that morning, but did not go into the office with me. The Doctor used the long slender clippers a couple of times. The Doctor said 'to come back Monday night.' That on Monday, Oct. 17th, 1927, affiant went to the office of Dr. Mount at about 7 p. m. Doctor asked how I was. I told him not very well. The Doctor said, 'You are in a pretty bad condition, but I can't make you come.' Then he used the clippers and inserted a red tube. This tube was left in me all night and I started coming sick. The first time affiant went to the office she told the doctor that she was about seven weeks over time and he said that he thought she was about five weeks. That on Oct. 19th, 1927, affiant went to the office of Dr. Mount and he asked how she was. I told him very bad.

I said there wasn't any afterbirth. He said there wouldn't be any, as it was such a short time. On Sunday, October 23rd, Dr. Mount came to the house. He asked how I felt. I told him I was sick and just passing little clots. He punched me in the stomach and back and rubbed the back of my neck. Violet Van Tassel.''

After Mrs. Berdue had gone to the Angelus Hospital and was under the care of Doctor Hansen he and her brother-in-law, Mr. Culberson, went to the office of the defendant and had a conversation with him concerning the defendant's treatment of Mrs. Berdue. According to the testimony of Dr. Hansen and Mr. Culberson, the defendant, in response to the question, ''What were you treating her for?'' replied, ''Well, she was overdue, past her period.'' Other statements and admissions made by the defendant in this conversation, as testified to by Dr. Hansen and Mr. Culberson, corroborate the declaration of Mrs. Berdue that the defendant treated her to overcome a pregnant condition. Dr. Hansen testified further that several days after the first conversation defendant called at his office and inquired as to the condition of Mrs. Berdue. When informed that she was in a very serious condition, defendant stated to Dr. Hansen: ''You know if she dies it means the pen for me''; and that a day or two later he asked Dr. Hansen to use his influence to protect him from any trouble, and offered to pay him for any aid he would render in the matter.

Appellant's first contention is that the court erred in permitting the so-called dying declaration to be read to the jury. He gives no specific reason for this assertion, except that the ruling was ''contrary to the doctrine announced in the case of *People* v. *Westcott*,'' 86 Cal. App. 298, [260 Pac. 901]. The point is not well taken. In the Westcott case there was no evidence whatever to indicate that the deceased, at the time he made the statement which was offered as a dying declaration, had any realization of the fact that he might pass away, or in fact that he was seriously wounded. In the instant case, Mrs. Berdue had on several occasions prior to the time that the statement was made, of her own volition, expressed to her sister and the doctor the belief that she would not get well. It also appears that her condition was such as to justify her belief. The evi-

dence was sufficient to meet the requirements that permit the introduction of a "dying declaration."

In his second point appellant does not indicate what particular testimony is the subject of his criticism other than referring to it as "the statement made by the defendant, alleged to be a confession." The pages of the reporter's transcript referred to include the testimony of two witnesses covering various matters. Among other things, these witnesses testified to a conversation with the defendant. The statement referred to as having been made by the defendant, in our opinion, did not constitute a confession. There were statements and admissions which were damaging to the defendant, but in our opinion no error was committed in permitting their introduction.

It is next urged that the court committed error in permitting testimony to the effect that surgical instruments commonly used by surgeons in treating the vagina and cervix had been seen in the defendant's office by Dr. J. J. Mortensen approximately three years prior to the time that the defendant was treating Mrs. Berdue. This testimony was offered by the prosecution in rebuttal, after the defendant on the stand had testified that he had not used any instruments in treating Mrs. Berdue other than a vaginal electrode and that he had inserted no other instrument in the vagina of this patient. He further testified that, with the exception of a wave generator, with its various electrical attachments, including the vaginal electrode, he had no other instruments in his office; and particularly he denied that he had a clippers or a catheter in his office. It was clearly pertinent to the issues involved in the case as to whether or not the defendant had used surgical instruments in treating Mrs. Berdue. Defendant was licensed only as a chiropractic doctor and he had no legal right to practice surgery. Certainly, upon the denial that he had any surgical instruments, it was within the right of the prosecution to impeach his testimony, if possible, by showing that he had such instruments as a part of his equipment in his office where he treated his patients. It is urged that the testimony of Dr. Mortensen related to a time so remote as to make it incompetent. We cannot agree with this assertion. The question as to the time when the defendant had surgical

instruments in his office may go to the weight of that testimony, but not to its competency.

The fourth and last assignment of error relates to certain instructions given and which it is claimed were erroneous, as also the refusal to give several instructions requested by the defendant. We have carefully examined all of the instructions referred to and are satisfied that but one point requires any discussion.

The court gave the usual instructions defining murder and also the degrees of murder, including an instruction defining manslaughter. It is urged that the court committed error in giving any instruction on the subject of manslaughter, for the reason that the prosecution presented its case upon the theory that deceased came to her death from an act of abortion committed by the defendant and that there was no issue before the jury that required an instruction on the subject of manslaughter. In support of this theory appellant cites the case of *People* v. *Huntington,* 138 Cal. 261 [70 Pac. 284].

There is no merit in this contention. It is too well settled to require discussion that under a charge of murder the jury may find the defendant guilty of any lesser offense that may be included within the charge, and, of course, manslaughter is so included. The fact that the district attorney believed that the defendant committed an act of abortion and urged upon the jury that theory of the case did not limit the jury to finding the verdict requested by the prosecution. There is substantial evidence in the record to justify the jury's conclusion, which undoubtedly formed the basis for the verdict, that the deceased came to her death by reason of the gross negligence of the defendant in the manner and character of the treatment he administered to her.

In the case of *People* v. *Huntington, supra,* there was no evidence in the record to support any theory except that the death was produced by an act of abortion committed by the defendant. Mr. Justice McFarland, in his opinion reversing the judgment of the lower court, says: "Instructions must be applicable to the facts and features of the case in hand." But assuming that there is language in the opinion in that case that furnishes some basis for appellant's contention, the case loses its effect in that respect largely because of the

fact that upon a retrial of the defendant he was found guilty of manslaughter and upon appeal the judgment was affirmed. (*People* v. *Huntington,* 8 Cal. App. 612 [97 Pac. 760].) ██ Furthermore, there is evidence that the defendant used instruments in the treatment of the patient which his license as a chiropractic physician did not permit him to do. This in itself constituted negligence. In addition, there is expert testimony to the effect that the conditions which caused the patient's death were induced by the careless and incompetent treatment accorded the deceased by the defendant.

██ In our opinion there is sufficient evidence to support the verdict of manslaughter.

The judgment is affirmed.

Houser, Acting P. J., and York, J., concurred in the judgment.