[Crim. No. 4286. In Bank.—June 27, 1940.]

THE PEOPLE, Respondent, v. CLAUDE C. LONG, Appellant.

Edward A. Cunha, John J. Taaffe and William F. Herron for Appellant.

Earl Warren, Attorney-General, William F. Cleary, Deputy Attorney-General, Seibert L. Sefton, Deputy Attorney-General, Matthew Brady, District Attorney, and John J. McMahon, Assistant District Attorney, for Respondent.

THE COURT.—Appellant herein was charged with having committed the crime of murder. On the trial of the cause the jury found him guilty of the crime of manslaughter, and this appeal was taken from the judgment which thereafter was rendered, as well as from an order denying a motion for a new trial. Following a decision rendered by the District Court of Appeal, a hearing was granted by this court in order that further consideration might be given to the question of prejudice assertedly suffered by defendant as a result of the giving of certain instructions. After a careful review of the entire record, it is the conclusion of this court that with respect to certain of the questions presented by the appeal the decision of the District Court of Appeal rendered on November 29, 1939, is correct. Therefore, that portion of said decision with which this court is in agreement is adopted herein, as follows:

"Appellant Dr. Claude C. Long, his wife, and one Ann Fisher, were charged with the murder of Genevieve Arganbright. Admittedly the death occurred while Dr. Long was performing an abortion upon the deceased. The jury acquitted Mrs. Long and Ann Fisher, but found Dr. Long guilty of manslaughter. . . .

"Appellant urges three main contentions on this appeal:

"1. That the evidence is insufficient to show either murder or manslaughter; that the cause was tried solely on the theory that the death resulted from an illegal abortion; that there is no evidence to show that the operation was performed without due caution and circumspection; that under such circumstances it was error to instruct on manslaughter; that the conviction for manslaughter constituted an implied acquittal on the murder charge, and constituted a determination that the operation was lawful; that the manslaughter verdict, based on the theory of a lawful operation performed without due caution and circumspection, is totally unsupported by the evidence.

"2. That the trial court erred in the giving of several instructions. . . .

"The evidence shows that Dr. Long, a duly licensed physician, maintained two offices—one on Valencia street and one on Haight street, both in San Francisco. The Valencia street office was in the middle flat of the building, had the doctor's name on the window, and his telephone was listed in the directory. The defendant Fisher, who is related to the Longs, was in charge of this office. When visited by the police, after the homicide, no medical or surgical equipment of any kind was found in this flat. Dr. Long testified that he seldom saw any patients at this office; that patients called there, or telephoned, and that Mrs. Fisher made appointments for them. The evidence also shows that in the flat above the offices occupied by Long on Valencia street there lived a Mrs. Spence, who was married to Mrs. Long's brother. She testified that defendant Fisher resided at the rear of the offices, and that in the time that she had been living there she had never seen Dr. Long on the premises.

"Dr. Long admittedly used the Haight street premises for seeing and treating his patients. These premises had been rented by Mrs. Long under the name of Young. A telephone was located at these premises under the name of Young, but at the request of the Longs the number was not listed in the telephone directory. The appellant frequently parked his automobile in a garage about seven blocks from the Haight street flat. On occasion the garageman accompanied Long to within a half block of the flat, where Long would get out of the car and the garageman would return the automobile to the garage. When arrested Long had in his possession keys to the back doors of these premises, but none fitted the front door. When visited by the police, after the homicide, an operating table and accessories, and various medicines used in connection with operations on women were found in the flat. Some instruments used in performing abortions were found in a closet, but the actual instruments used by the appellant in performing the abortion on Mrs. Arganbright were admittedly removed by him the night she died and turned over to the police later at the time of his arrest.

"The husband of the deceased testified that his wife was two and one-half months pregnant, was apparently in good health, and that she possessed none of the visual symptoms

of a bad heart. He further stated she was athletic and took long hikes, danced, liked to swim and play tennis, and, although she worked for the W.P.A. during the day, performed the usual household tasks. On May 19, 1937, the deceased, in the presence of her husband, telephoned to Dr. Long's Valencia street office and asked the woman who answered the phone for an appointment. She was told to call at that office between two and four o'clock. Mr. and Mrs. Arganbright called that afternoon at the Valencia street office, where they were admitted by defendant Fisher. In the presence of the husband, Fisher asked the deceased her name, and questioned her concerning the identity of her companion. The husband was placed in one room and the deceased and Fisher went into another. The husband overheard Fisher ask the deceased how long she had been pregnant, and also heard Fisher tell his wife not to bring her husband along when she returned the next night.

"The next day, May 20, 1937, Mrs. Arganbright went to work and returned home at the usual hour. She left home at about quarter to seven in the evening, telling her husband she was going to have an abortion performed by Dr. Long; that she was going by street car to the Valencia street office, where she was to be taken by a chauffeur to some place on Haight street. When she left her home she had with her $50 which she had borrowed, which sum Fisher had told her the day before was necessary for the operation.

"Late in the evening of May 20, 1937, Mrs. Arganbright died at the Haight street premises while the appellant was performing an abortion upon her.

"So far as the prosecution's case is concerned, chronologically, the next pertinent testimony was given by Dr. Goldsand. He testified that between 10:20 and 10:30 p. m. he received a telephone call from defendant Fisher; that she asked him to come immediately to the Haight street premises to see a very sick patient; that he arrived in eight or ten minutes; that Fisher admitted him and told him to hurry up the stairs; that he was ushered into a bedroom where he saw Dr. and Mrs. Long and the deceased, who was lying on a bed, attired in her street clothes, her lower extremities being covered with a blanket. The appellant asked Dr. Goldsand to examine the patient. Upon such examination Dr. Goldsand ascertained that Mrs. Arganbright was dead. He administered ephedrin

sulphate, but it did not revive the patient. He then told Dr. Long the woman was dead. He testified that Long then asked him to sign the death certificate, but he refused, informing Long that because he was the physician who had attended the deceased during her lifetime, it was his, Long's, duty to sign the death certificate. Long, he stated, remained silent, whereupon he, Goldsand, left the premises. Dr. Long testified that he understood Dr. Goldsand to state he would sign the certificate. This conflict, in view of the conviction, must be resolved in favor of the prosecution.

"The next link in the prosecution's chain of evidence was furnished by an employee of an undertaking establishment in San Francisco. He testified that he and a fellow employee went to the Haight street flat to get a body in response to a telephone call; that he arrived at about 2:30 a. m. of the morning of May 21st; that he met Mrs. Long and Ann Fisher there; that Dr. Long was not there; that he was informed by the two women that they were not members of the deceased's family but were 'very dear friends'; that the relatives had left and would complete arrangements with the undertaking parlor in the morning; that Dr. Goldsand had been the attending physician and that he had been in attendance for at least half an hour before she passed away; that the deceased had died from a heart attack. In response to an inquiry as to whether there was a telephone in the flat from which he could phone Dr. Goldsand for verification he was told that there was no telephone; that Dr. Goldsand had stated everything was in order and that he would sign the death certificate in the morning. The next morning the body was embalmed, and in the afternoon, when no relatives had called or death certificate had been signed, the matter was referred to the coroner. Both Dr. Goldsand and the employees of the undertaking establishment testified as to the physical appearance of the body. The conditions testified to were consistent with the defense's theory that the deceased had died from heart failure.

"On the morning of May 21st the appellant and his wife registered at the Chancellor Hotel in San Francisco under the false and assumed names of Mr. and Mrs. C. Young of Sonora, California. At the time they registered they were informed that all rooms had been engaged for that night and that they must give up their room by 4 p. m. They left the

Chancellor Hotel before 4 p. m. and went to the Cecil Hotel where they again registered under false and assumed names.

"Late in the afternoon of May 21st the husband of deceased telephoned the Valencia street office of appellant. Defendant Fisher answered the telephone, and told him that she knew nothing of his wife's whereabouts, and that Dr. Long was out of town. Later the police arrived, and he then discovered his wife was dead.

"Dr. and Mrs. Long were arrested at the Cecil Hotel on May 22d. At that time, after telephoning to their attorney, they had changed their registration and were registered under their proper names. Defendant Fisher left San Francisco and was located several weeks later in Nevada City.

"On the trial neither Mrs. Long nor Ann Fisher took the witness stand. Appellant Long did take the stand in his own behalf, and testified in detail concerning the facts and circumstances surrounding the death.

"It was the main theory of the prosecution that Genevieve Arganbright had died as the result of an illegal abortion; that the abortion was not necessary to preserve her life; that she died as a result of surgical shock and from hemorrhage caused by the abortion; that she did not die as a result of a heart condition. However, although this was the main theory of the prosecution, it was not the only theory. As will later appear in detail, the prosecution from the very first of the trial refused to limit itself to this theory, and offered testimony that the death resulted from an abortion performed without due caution and circumspection. This distinction becomes important because, so far as this case is concerned to constitute murder, an abortion must be an illegal abortion— that is, one not necessarily to preserve the life of the woman aborted, (sec. 274, Pen. Code), while to constitute manslaughter, an abortion must be a lawful abortion, performed 'without due caution and circumspection'. (Sec. 192, Pen. Code.) The main theory of the defense was that the operation was necessary to preserve the life of the deceased; that the deceased had an ailing heart resulting from a mitral stenosis; that this heart might decompensate at any time; that this heart could not stand the burdens of full pregnancy and of childbirth; that the interruption of the pregnancy was necessary to preserve her life; that the operation was performed

with due caution and circumspection; that Mrs. Arganbright died from the heart condition.

"There can be no doubt that the deceased was suffering from a heart affected with a mitral stenosis—that is, the mitral valve of the heart had become infected and had become calcified so as to reduce the diameter of the orifice of the valve. The medical witnesses testified that this condition as it progresses results in the blood's passing through the valve with increased difficulty. As a result, the heart must pump harder and faster, and to do this becomes enlarged. The heart becomes decompensated when it is unable to meet the increased load. When this condition occurs, death ensues. They also testified that there are various visual symptoms of a decompensating heart, such as shortness of breath and discoloration. One of the main questions involved at the trial was whether the heart condition of deceased had progressed sufficiently so that the added burdens of pregnancy and childbirth might cause the heart to decompensate.

"In support of his defense Dr. Long testified that the deceased first visited him in March of 1937; that he had then examined her and found she had a mitral stenosis; that her heart was a border-line heart; that the compensation was fairly good, but decompensation might occur at any time; that he was not sure at that time she was pregnant; that he formed the opinion at that time that if she were pregnant an abortion was necessary to preserve her life; that he told her to return in two weeks; that he did not see her again until the night of her death. The appellant produced no office record of this visit, but contended that such a record had been made, but that he had been unable to find any such record after the police had visited the premises. We are of the opinion that the jury might well have disbelieved all of this testimony concerning the March visit. The jury might well have believed from the testimony of the husband concerning the facts surrounding the telephone conversation and the visit to Dr. Long's office of May 19th, that this was the first visit of the wife to Dr. Long's office.

"The appellant further testified that on the evening of May 20th when decedent returned, she explained that she was definitely sure that she was pregnant; that she suffered from a constant tired feeling, from precordial pain and shortness of breath, and that she had a definite palpitation of the

heart—all definite indications of a diseased heart. He also testified that he again examined the heart and found the murmurs and thrill which indicated a definite mitral stenosis; that he thereupon concluded that a therapeutic abortion was necessary to preserve her life; that he told the deceased of this conclusion; that she consented to the abortion. Again it is proper to stop and comment on this testimony. We think from all the surrounding circumstances that the jury might well have concluded that this testimony to the effect that he had examined the heart of the deceased and discovered the mitral stenosis was false. The method used by the defendant in his business; his actions in attempting to get Dr. Goldsand to sign the death certificate; his attempt at flight and concealment; his failure to notify the husband of the deceased; his failure to sign a death certificate—all lead to but one inference, and that is that appellant thought he had performed an illegal operation and that the deceased had died as a result thereof. His actions all demonstrate a consciousness of guilt. However, the mere fact that appellant may have believed or intended to commit an illegal abortion, if in fact it was a legal abortion to preserve life, probably would not make the resulting homicide murder. We may assume, for the purposes of this opinion, that, even though the jury could have found that appellant did not know of the existing heart condition, if, in fact the heart condition was such that an abortion was necessary to attempt to preserve her life, this would be a complete defense to the murder charge.

"Dr. Long then testified as to the method used in performing the operation and as to what then happened. He testified that while performing the operation the patient's heart failed and that he was unable to revive her. The balance of his testimony in which he attempted to explain the reasons for his method of conducting his business; his assuming a false name; his failure to sign the death certificate; his attempt at concealment, etc., need not be here commented on. The jury might well have believed, and apparently did so believe, that such testimony was false.

"As already indicated, it is appellant's main contention that the evidence without conflict established that the heart condition was such that an operation was necessary to attempt to preserve the life of deceased; that she died from the heart condition; that there is no evidence to sustain either

a murder or manslaughter verdict; that in any event he was acquitted of the murder charge and convicted only of manslaughter; that to sustain the manslaughter conviction there must be evidence of lack of due caution and circumspection in the performance of the operation; that there is no such evidence in the record.

"There is no need to review at length the evidence that demonstrates that, had the appellant been convicted of murder, the record would sustain such a conviction. All of the witnesses for both prosecution and defense agreed that the deceased had a mitral stenosis, but there was a sharp conflict as to whether the mitral stenosis had progressed to the point where an abortion would have been necessary, and there was a sharp conflict as to the cause of death. The autopsy surgeon and the pathologist in the coroner's office both testified that the condition of a heart during life could be ascertained from a gross or from a microscopic examination after death; that they had made such an examination; that this heart was not enlarged; that it was not decompensating prior to death but was functioning properly; that the heart condition was an old one and was not progressing; that the heart was in such a condition that the deceased could have gone through a normal labor. The pathologist, Dr. Carr, and several other doctors testified positively that the operation was not necessary to preserve the life of the deceased. Dr. Carr and Dr. Leland testified that deceased did not die from the heart disease but died from the abortion—from surgical shock and hemorrhage caused by the abortion. The husband of the deceased, members of her family and several of her coworkers testified that deceased possessed none of the visual symptoms that would tend to indicate a dangerous condition of the heart. There was a clear conflict in the evidence as to whether the deceased was in danger from the heart condition, and whether the heart condition caused death. The evidence also showed that in 1932 the deceased gave birth to a child at St. Mary's hospital. The records of that hospital, and the testimony of the doctors therein charge, showed that, although the deceased then had a mitral stenosis, she had a normal labor and delivery; that the heart doctor had then determined that the patient had a well compensated mitral stenosis, which means that the heart was then taking care of itself and there was no sign of decompensation. The doctors then in attendance

testified that if her heart was the same in 1937 as in 1932 an abortion was not necessary; that most doctors require some evidence of decompensation before they will abort. They conceded however, that some doctors advocate an abortion in all cases of mitral stenosis. This was denied by several prosecution witnesses. Several of the doctors testified that correct medical practice would require sending a patient suffering from mitral stenosis to a heart specialist for treatment.

''It is true that there was considerable expert testimony offered by appellant in addition to his own testimony to the effect that an abortion was reasonably required in the instant case. After laying the proper foundation, portions of various medical books were read into evidence, their general tenor being that some doctors recommend abortions in all cases of mitral stenosis. It also appeared that in November, 1933, deceased visited the Mt. Zion Hospital Clinic. At that time she apparently believed that she was pregnant. Her symptoms were then such that, coupled with the doctors' clinical examination then made of her heart, they testified that, had she been then pregnant, they would have recommended an abortion. It was later discovered she was not then pregnant, so that no abortion was required.

''This review of the record demonstrates that there was sufficient evidence upon which the jury could have found the abortion was not necessary to preserve life, and, therefore, illegal, and that the resulting death was murder in the second degree.

''Appellant contends that even if it be admitted that the evidence was conflicting on whether the abortion was necessary to preserve life, that by the conviction of manslaughter he was acquitted of murder, and therefore the jury determined this conflict in his favor—that is, determined that the abortion was necessary to preserve life. Based on this premise it is next urged that there is no evidence at all of lack of due caution and circumspection in the performance of the operation, and, therefore, there is no evidentiary support for the verdict of manslaughter. The same contention is also made in a slightly different form—that is, that it was error for the trial court to instruct on manslaughter for the reason that there was no evidence to support such a verdict. In support of these contentions, the appellant mainly relies on *People* v. *Huntington*, 138 Cal. 261 [70 Pac. 284]. In that

case, which was a prosecution for a homicide growing out of an abortion, the prosecution's only theory was that the abortion was illegal and that the offense, if any, was murder, and, apparently, offered evidence only on this issue. The trial court instructed on, and the defendant was convicted of, manslaughter. This conviction the Supreme Court reversed. The Court emphasized that 'The statements of the district attorney, and the whole course of the trial, show that the case was tried upon the sole theory that appellant, who is a physician, caused the death of the deceased by attempting to commit a felony,—to wit, an abortion.' The court recognized that, generally speaking, under an indictment for murder the defendant may be convicted of manslaughter, but held that that rule does not apply when the theory and evidence does not justify a manslaughter verdict. The court held it error to have thus injected manslaughter into the case, and further held that it was error, in view of the record there presented, having instructed on manslaughter, not to have further instructed on the degree of care required to show lack of due caution and circumspection, and that this was not cured by lack of request by appellant for an instruction on that point. The cause was remanded for a new trial. The district attorney then attempted to retry the defendant for murder, apparently on the theory that on this trial he could prove murder, but could only secure a manslaughter conviction on the murder evidence. In *Huntington* v. *Superior Court,* 5 Cal. App. 288 [90 Pac. 141], it was held that the original conviction of manslaughter constituted an acquittal of murder, and that he could not again be tried for murder. The defendant was then tried for manslaughter and was convicted. In *People* v. *Huntington,* 8 Cal. App. 612 [97 Pac. 760], his conviction was affirmed. On this last trial, the court instructed the jury that if they believed that the evidence showed murder they could convict of manslaughter. There can be no doubt that there is language in each of these three cases inconsistent with language found in the other two. The courts, in more recent cases have attempted, rather unsuccessfully, to reconcile these conflicts. There have been several abortion cases holding that a manslaughter instruction is properly refused where there is no evidence of want of due care. (*People* v. *Balkwell,* 143 Cal. 259 [76 Pac. 1017]; *People* v. *Northcott,* 45 Cal. App. 706 [189 Pac. 704];

*People* v. *Hickok*, 28 Cal. App. (2d) 574 [83 Pac. (2d) 39]; see, also, *People* v. *Wright*, 167 Cal. 1 [138 Pac. 349].) In *People* v. *Kelley*, 24 Cal. App. 54 [140 Pac. 302], the theory of the first Huntington case was reaffirmed, and a conviction of manslaughter, based on murder evidence in a non-abortion case, reversed.

■ "The respondent, in support of the contention that it is not reversible error to instruct on manslaughter, even in the absence of evidence of lack of due caution and circumspection, mainly relies on several non-abortion cases where the Huntington cases have been somewhat critically discussed. (*People* v. *Wolcott*, 137 Cal. App. 355 [30 Pac. (2d) 601]; *People* v. *Warr*, 22 Cal. App. 663 [136 Pac. 304].) He also relies on the general rule, frequently stated by the courts, that manslaughter is an offense included within murder, and that a manslaughter verdict based on murder evidence will be upheld because the error in instructing on manslaughter, if any, is favorable to defendant and, therefore, he cannot complain. (*People* v. *Muhlner*, 115 Cal. 303 [47 Pac. 128]; *People* v. *Shimonaka*, 16 Cal. App. 117 [116 Pac. 327]; *People* v. *Roselle*, 20 Cal. App. 420 [129 Pac. 477]; *People* v. *Tugwell*, 32 Cal. App. 520 [163 Pac. 508].) We do not find it necessary to pass on this contention. Whatever may be the rule in cases where the defendant is tried solely on the theory that death resulted from an illegal abortion, and no evidence is offered of lack of due caution and circumspection, there can be no doubt that where the main theory of the prosecution is that death resulted from an illegal abortion, but some substantial evidence of want of due caution and circumspection is offered and received, an instruction on manslaughter may properly be given. This problem was involved and fully discussed in *People* v. *Wright*, 167 Cal. 1 [138 Pac 349], and in *People* v. *Mount*, 93 Cal. App. 81 [269 Pac. 177]. In the first case the trial judge instructed on both murder and manslaughter. The jury convicted of murder, and on appeal it was held not to have been error to instruct on manslaughter, there being some evidence of lack of due caution and circumspection. In the second case, on similar instructions, the jury convicted of manslaughter. This was affirmed on appeal, on the ground that there was evidence of negligent performance of the operation.

"In our opinion, the present case falls within the rule of these last two cited cases. For that reason we do not have to decide now whether in a case where no evidence of lack of due caution and circumspection is offered and received, a manslaughter verdict can be supported solely on murder evidence, or whether, in such a case, it is reversible error to instruct on manslaughter.

"It is true that the respondent seeks to support the verdict solely on the theory above discussed that murder evidence may support a manslaughter verdict, and that no contention is made that there is any evidence that the appellant was guilty of lack of due caution and circumspection in the performance of the operation—in fact, in discussing another point, at page 48 of the brief of the attorney general it is stated: 'in this case the question of malpractice was not in issue; nor was there in this case any question presented during the trial concerning the performance of the operation without due caution and circumspection'. This concedes entirely too much. A reading of the record demonstrates two things—first, that from the very first of the trial the prosecuting attorney refused to limit himself to the theory of murder; and second, that there is substantial evidence from which the jury might well have inferred that appellant did not use due caution and circumspection in the performance of the operation, and that the death resulted therefrom. In his opening statement to the jury the prosecuting attorney referred to the fact that he would prove, among other things, that the cervix of deceased was 'torn, dilated and mutilated'. Before a witness was sworn, the attorney for defendant demanded to know whether one of the theories of the prosecution was to be lack of due care on the part of Dr. Long. The court refused to compel the prosecutor to definitely state, pointing out to counsel that they could not now complain of surprise because they were being warned in advance that they would be expected to defend against that theory. Finally, after considerable argument, the trial judge informed defendant and his counsel that both murder and manslaughter were involved in the charge. No claim of surprise or being misled can now be made.

"Now as to the evidence. As already indicated, the main theory of the prosecution was that death resulted from an illegal abortion, and the major portion of the evidence introduced was introduced on this theory. However, all of

the medical witnesses for the prosecution were asked questions and were cross-examined on points relating to the charge of lack of due caution and circumspection.

"Dr. Carr, pathologist to the coroner's office, testified that one of the causes of death was shock and hemorrhage following an interrupted pregnancy; that the mitral stenosis had existed since childhood and was not progressive; that the cervix shows a lateral laceration on either side, meaning 'that the cervix has been manually torn by an instrument'; that 'the cervix had been actually torn from the opening to the uterus and blood had run from these areas into the tissue adjacent to the tear'; that 'part of the placenta that was nourishing this baby had actually been pulled out through the cervix into the vagina'; that 'apparently an attempt had been made to enter her cervical canal, and by some false jabbing the upper vaginal reflection had actually been torn'; that a proper therapeutic abortion is performed in a hospital; that in a proper operation the uterus is dilated slowly with progressive dilators; that progressive dilators will not tear the cervix; that the tears here present indicate progressive dilators were not used. Dr. Long admitted using a type of dilator which Dr. Carr testified was not the proper or approved type. Dr. Carr also testified that, according to approved practice, a therapeutic abortion is performed in a hospital because, among other things, an oxygen tank and carbon dioxide are available for emergencies. These emergency facilities were not present at the Haight street flat of appellant. Dr. Carr also testified that the tearing and mutilation and puncturing of the cervix, described by him, is a painful and shocking procedure, and would produce shock in the entire body, and that deceased died from shock; that it is the usual custom and practice of doctors to give a general anesthesia when performing an abortion, for the reason that this reduces shock; that with 'the mutilation and the perforation one sees here, a rather deep anesthesia would be required to reduce the pain'. Dr. Long testified he did not use a general anesthesia. There was other medical testimony that if a person possessed the symptoms of a decompensating heart testified to by Dr. Long, that approved practice, before performing the abortion, would be to send the patient to a heart specialist and to hospitalize her for some time to build up her heart so it could stand the

abortion; that the type of local anesthetic used by appellant would not render the patient immune from pain.

"Other testimony could be referred to from which the jury could have inferred that appellant did not exercise that care and circumspection required in such cases. The testimony recited is sufficient to support the manslaughter verdict."

■ Appellant also contends that the trial court committed prejudicial error in the giving of certain instructions. With regard to the question of reasonable doubt the trial court instructed the jury as follows:

"If you find from the evidence beyond reasonable doubt that the defendant Claude C. Long performed or attempted to perform an operation upon the person of the deceased for the purpose of delivering an unborn child and that the operation or attempted operation was performed with due caution and circumspection, and if you believe from all of the evidence that the operation was necessary to preserve the life of the decedent and that death resulted from such operation, you shall nevertheless find the defendant not guilty; *but on the other hand,* if you believe beyond a reasonable doubt that due caution and circumspection were not exercised and if you believe that the operation was not necessary to preserve the life of Genevieve Arganbright and that death resulted from such operation, then it is your duty to bring in a verdict of guilty." (Emphasis added.)

The first portion of that instruction, which in effect told the jury that it would have to find that defendant had established his defense "beyond reasonable doubt" before he could be found not guilty, was clearly erroneous. However, that portion of the instruction was requested by defendant. Of its own motion the court added the latter portion which begins with the words in italics, and which constitutes a correct statement of the law, though not as clear as might be desired. In other words, by its addition to the instruction the court was thereby informing the jury that should it find beyond a reasonable doubt that the operation was not performed with due care and circumspection it should bring in a verdict of guilty of manslaughter,—whereas if it found beyond a reasonable doubt that the operation was not necessary to preserve life it should bring in a verdict of guilty of murder in the second degree. The joining of those two theories in one instruction, although perhaps confusing, could have caused

no prejudice to defendant because, by reason of his acquittal
on the second degree murder charge, it could not now be
argued that the jury may have been misled into bringing in
a verdict of guilty on said charge, though only a showing of
lack of due care and circumspection may have been made and
found by the jury. But with reference to the instruction con-
sidered as a whole, defendant seeks to invoke the rule that
where the court modifies a proffered instruction, if erroneous,
the error becomes that of the court. Although the rule is as
stated, this is not a case where a change made by the trial
judge has brought about the error complained of. Here the
language added by the court was correct in itself, as herein-
before explained. The substance of the erroneous instruc-
tion as requested by defendant was not altered in any re-
spect. The only change made by the court was by way of
addition to that which had been proposed by defendant. Had
the two portions of the instruction been separated by a period,
it is improbable that a claim of modification would have been
made. Also, the first part of the instruction, as proffered by
defendant, consisted of a purported statement of the law com-
plete in itself, as did also the latter part which was given by
the trial court of its own motion. In those circumstances,
therefore, it cannot successfully be argued that by the giving
of the latter part of the instruction the trial court *modified*
the first part, so as to compel invocation of the rule that where
a trial court modifies a proposed instruction, if erroneous, the
error becomes that of the court. (*Baker* v. *Borello,* 131 Cal.
615 [63 Pac. 914]; 2 Cal. Jur., pp. 848, 849.)

Another instruction complained of by appellant re-
lated to the subject of expert testimony. It reads as follows:

(1) ''Duly qualified experts may give their opinions on
questions in controversy at a trial to assist the jury in decid-
ing such questions. The jury may consider the opinion with
the reasons stated therefor, if any, by the expert who gives
the opinion. The jury is not bound to accept the opinion of
any expert as conclusive, but should give to it the weight to
which they shall find it to be entitled. The jury may, how-
ever, disregard any such opinion, if it shall be found by them
to be unreasonable.

(2) ''You are instructed that in considering the expert
testimony which has been offered in this case, you should
weigh it with all the other evidence in the case; you are not

bound to determine any fact in accordance with the opinion of such expert, if not convincing to your mind.

(3) "You are instructed that you may regard the testimony of an expert as merely *advisory,* and you are instructed that *you may disregard altogether the testimony of such expert,* and you may form your own conclusions from all the evidence submitted to you.

(4) "After considering all these things, and any other circumstances in evidence, you are to give such testimony such weight as you, in your judgment, think it is entitled to, and if convincing and carrying with it a belief in its truth, act upon it; if not, you may and you have a right to reject it." (Emphasis added.)

The first paragraph of that instruction is substantially identical with the provisions of section 1127b of the Penal Code. However, the language of that portion of the instruction to which appellant directs his criticism is that which appears in italics in paragraph three. Unquestionably this was an unfortunate choice of words resulting in possible ambiguity, but when considered in its entirety, as any instruction must be considered, it was not prejudicially erroneous. Certainly, "the jury may disregard altogether the testimony of such expert" if it is not based upon substantial reasons or there are circumstances justifying a determination that it has no probative value or it is unreasonable. We must assume that the jurors, as persons of ordinary intelligence, understood that the testimony of an expert was not to be disregarded capriciously but should be considered in accordance with the rules which had been stated to them. The cases of *Pearson* v. *Crabtree,* 70 Cal. App. 52, 58 [232 Pac. 715], and *Hirshfeld* v. *Dana,* 193 Cal. 142, 153 [223 Pac. 451], cited by appellant in support of his contention that the instruction was erroneous and prejudicial to his rights, were civil cases which had been decided prior to the enactment of section 1127b of the Penal Code.

■ Appellant further contends that the trial court erred in refusing to grant defendant a new trial, the motion for which was made on the grounds of (1) newly-discovered evidence, and of (2) asserted misconduct of the jury. The purpose of the proposed newly-discovered evidence was to impeach the testimony of the husband of the deceased. It has been ruled that newly-discovered evidence which would tend

merely to impeach a witness is not of itself sufficient ground for granting a new trial. (*People* v. *Granillo,* 140 Cal. App. 707, 719 [36 Pac. (2d) 206]; *People* v. *Vejar,* 93 Cal. App. 259 [269 Pac. 671].) To warrant the granting of a new trial on the ground of newly-discovered evidence it must be such as to render a different verdict reasonably probable on a new trial. (*People* v. *Shaver,* 7 Cal. (2d) 586, 593 [61 Pac. (2d) 1170]; *Brannock* v. *Bromley,* 30 Cal. App. (2d) 516, 520 [86 Pac. (2d) 1062].) In the opinion of this court such a result would not have been accomplished herein if a new trial had been granted. Under all the circumstances it cannot be said that the trial court abused its discretion in that respect.

In support of his motion for a new trial on the ground of asserted misconduct of the jurors, defendant introduced the affidavits of four of the jurors in which each asserted that during the deliberations of the jury certain jurors had read a newspaper article pertaining to the "flaying of abortionists" by a witness called by the prosecution. The trial court refused to consider those affidavits on the ground that the jurors could not impeach their own verdict. There is no error in that ruling. (*People* v. *Wong Loung,* 159 Cal. 520 [114 Pac. 829].)

It is unnecessary to consider other points advanced by appellant in support of his contention that the judgment should be reversed. An examination of the entire record, including all of the evidence, reveals no prejudicial error.

The judgment and order are affirmed.

CARTER, J., Dissenting.—I dissent.

In my opinion the giving of the instruction to the jury: "that you may regard the testimony of an expert as merely *advisory,* and you are instructed that *you may disregard altogether the testimony of such expert,* and you may form your own conclusions from all the evidence submitted to you", constituted prejudicial error and justifies a reversal of this case.

The majority opinion states:

"There can be no doubt that the deceased was suffering from a heart affected with a mitral stenosis—that is, the mitral valve of the heart had become infected and had become calcified so as to reduce the diameter of the orifice of the valve. The medical witnesses testified that this condition as it progresses results in the blood's passing through the

valve with increased difficulty. As a result, the heart must pump harder and faster, and to do this becomes enlarged. The heart becomes decompensated when it is unable to meet the increased load. When this condition occurs, death ensues. They also testified that there are various visual symptoms of a decompensating heart, such as shortness of breath and discoloration. One of the main questions involved at the trial was whether the heart condition of deceased had progressed sufficiently so that the added burdens of pregnancy and childbirth might cause the heart to decompensate.''

In other words, the principal issue in the trial of this case and the sole foundation stone upon which the defense was based, namely, that the performance of the abortion was necessary to preserve the life of the deceased, was of necessity, and in the very nature of things, predicated solely upon expert testimony. Common sense as well as legal reasoning dictates that no one without expert knowledge and skill in the subjects of anatomy and medical science would be qualified to testify on this subject, and it has been the settled law of this state for decades that when the sole issue in a case is the subject of expert knowledge of medical science, that such issue must be decided solely upon the testimony of those learned in the practice of medicine and surgery. (*Perkins* v. *Trueblood,* 180 Cal. 437 [181 Pac. 642]; *Arnold* v. *Hopkins,* 203 Cal. 553 [265 Pac. 223]; *Houghton* v. *Dickson,* 29 Cal. App. 321 [155 Pac. 128]; *Dameron* v. *Ansbro,* 39 Cal. App. 289 [178 Pac. 874]; *Pearson* v. *Crabtree,* 70 Cal. App. 52 [232 Pac. 715]; *William Simpson Const. Co.* v. *Industrial Acc. Com.,* 74 Cal. App. 239 [240 Pac. 58]; *Ingamells* v. *Goodfellow,* 109 Cal. App. 62 [292 Pac. 162]; *Roberts* v. *Parker,* 121 Cal. App. 264 [8 Pac. (2d) 908].)

In a very able and exhaustive opinion written by my learned associate, Mr. Justice Curtis, in the case of *Pearson* v. *Crabtree, supra,* when he was a member of the District Court of Appeal of the Second Appellate District, this very sound proposition of law was enunciated, and its soundness or the justness of its application to cases of this character has never been questioned. In that case the plaintiff sued the defendant, a physician, for malpractice and recovered a verdict in the trial court. The court refused to give the following instruction requested by the defendant:

''The court instructs you that in considering whether the defendant in his examination, diagnosis, treatment and care of plaintiff's injured limb exercised ordinary care and skill, you cannot set up a standard of your own, but must be guided in that regard solely by the testimony of physicians; and if you are unable to determine from the testimony of the physicians introduced as experts, what constitutes ordinary care and skill under the circumstances of this case, then there is a failure of proof upon the only standard for your guidance, and the evidence is therefore insufficient to warrant a verdict for the plaintiff.'' But on its own motion gave the following instruction:

''You are instructed that the opinions of the doctors who have testified in this case as experts are merely advisory, and you are not bound to accept such opinions as true. You should accord to such opinions such weight as from all the facts and circumstances in the case you may believe they are entitled to receive; or you may altogether disregard such opinions in so far as you may believe from all the facts and circumstances in the case that such opinions are unreasonable.'' In that case Mr. Justice Curtis stated:

''The authorities from other jurisdictions appear to be in accord upon this question with the rulings of the supreme court of the state of Colorado and that of our own state. It necessarily follows, therefore, if this instruction refused by the court correctly stated the law, then it was prejudicial error for the court to give the second instruction above set out, which it gave upon its own motion. For in this second instruction the court told the jury that they might disregard altogether the opinions of the experts testifying in the case, if, from all the facts and circumstances in the case, they believed that such opinions were unreasonable. In other words, the court in effect instructed the jury that if there were facts and circumstances in the case, testified to by lay witnesses, which the jury believed and which rendered the opinions given in the case by expert witnesses unreasonable, then the jury were at liberty to reject altogether the opinions of the experts. As we have already noted, such is not the accepted rule, and to so instruct the jury was highly prejudicial to the rights of the appellants. . . . We, therefore, are of the opinion that the rule of law set forth in the above instruction which the court refused to give was applicable to the issues

in this case, and it was therefore error on the part of the court, prejudicial to the rights of the defendants, to give the instruction which it did and whereby it instructed the jury that the opinions of the doctors were merely advisory and that the jury were not bound to accept them, but might disregard them altogether if from all the facts and the circumstances in the case they believed them unreasonable.

"Judgment is reversed."

The case of *Pearson* v. *Crabtree, supra,* has been uniformly followed in this and other jurisdictions where the common law prevails and is recognized as the settled law of this state.

There is little doubt, in my opinion, that if the case at bar were a civil action in which a judgment had been recovered by a plaintiff upon the same factual situation as that disclosed by the record in this case, and such an instruction had been given as the one quoted in the majority opinion in this case, this court would have no hesitancy in reversing such a judgment upon the authority of the case of *Pearson* v. *Crabtree, supra,* and *Hirshfeld* v. *Dana,* 193 Cal. 142 [223 Pac. 451], upon the ground that such instruction was prejudicially erroneous and probably resulted in a miscarriage of justice.

To hold that the giving of such an instruction as the one given in the case at bar is prejudicial in a civil case and not in a criminal case, is to my mind a holding in effect that life and liberty are of less concern to human beings than property. I am opposed to any such concept and I firmly believe that the application of the law should be more rigid and more strictly construed in the protection of the lives and liberties of our people than in the protection of their property rights.

There can be no escape from the conclusion that the jury in the case at bar were plainly told by the trial judge not only that they could regard the testimony of an expert as merely *advisory,* but that they *may disregard altogether the testimony of such expert,* and form their own conclusions from all the evidence submitted to them. To say that such an instruction did not deprive the defendant of the benefit of the expert testimony submitted by both the prosecution and the defense is stating an obvious contradiction. If such an instruction can be cured by the application of section 4½ of article VI of the Constitution, then in my opinion it must necessarily follow that a defendant in a criminal case is not entitled as a matter of legal right to have the jury instructed on the law

applicable to the facts of the case presented to the trial court during the trial of his case and that this section of the Constitution can be resorted to for the purpose of depriving a person of the equal protection of the law guaranteed by the 14th Amendment to the Constitution of the United States.

In my opinion, the effect of the giving of the above-mentioned instruction was to deprive the defendant of the fair and impartial trial guaranteed by the Constitution and laws of this state and that the judgment and order denying him a new trial should be reversed.

Rehearing denied. Carter, J., voted for a rehearing.