[Crim. No. 4976. In Bank. Aug. 19, 1949.]

THE PEOPLE, Respondent, v. ANDREW J. POWELL, Appellant.

Samuel L. Laidig for Appellant.

Fred N. Howser, Attorney General, Frank Richards, Deputy Attorney General, William E. Simpson, District Attorney, and Jere Sullivan, Deputy District Attorney, for Respondent.

SCHAUER, J.—Defendant was charged with abortion (count 1) and murder (count 2) of Birda Johnson. The trial court, sitting without a jury, found that he was guilty as charged in count one; on count two it found him guilty of manslaughter. Defendant appeals from the judgments of conviction and from an order denying his motion for new trial. An important prosecution witness was the victim's husband, an accomplice of defendant, who testified, among other things, to many admissions of defendant. Defendant contends that the testimony of the accomplice is not "corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense," as required by section 1111 of the Penal Code, and that the corpus delicti is not sufficiently established by evidence independent of the assertedly uncorroborated testimony of the husband to the admissions of the defendant. Defendant argues, further, that the evidence, if it shows any crime of homicide, shows that the count two offense is murder of the second degree and that the trial court, doubtful that the evidence sufficiently established that defendant had committed a criminal homicide, "exceeded his power" by a compromise determination that defendant was guilty only of manslaughter. We have concluded that the accomplice's testimony is sufficiently corroborated; that there is adequate evidence of the corpus delicti apart from defendant's extrajudicial admissions; and that, although defendant could have been convicted of the offense of second degree murder, he cannot predicate a reversal on the fact that he was convicted only of manslaughter.

The evidence tending to show defendant's guilt of the charges, apart from the testimony of the accomplice, is as

follows:[1] Birda Johnson died on January 23, 1948, of septicemia. She was 26 years of age. Prior to December 29, 1947, she had been in good health. She had borne seven children, six of whom were living. The two youngest children were born in March, 1946, and March, 1947, respectively; each of the births was normal and at the time of each the mother was in good condition.

On October 21, 1947, Birda and her husband borrowed $250 from a bank; the application for the loan, signed by them, states that the money was "to be used for purpose of Doctor Bill." On October 23, Birda made her first visit to defendant, a chiropractor, and told him she believed that she was pregnant. A pregnancy test made on November 6, 1947, showed a negative result. On December 29, 1947, Birda went on a streetcar to defendant's office. There (according to a dying declaration of Birda made on January 22, 1948, one day before her death) defendant "put some packs in her . . ., he used a long instrument; when he put it inside of me it hurt so I fainted." When she came from defendant's office on December 29 Birda was ill. Defendant called a cab and the driver helped her from the office to the cab because "She couldn't make it downstairs." Defendant asked Birda's daughter, who had accompanied her to defendant's office, "to have my father call him." As she entered the cab and frequently thereafter Birda vomited.

On the evening of December 29, Birda's husband informed defendant by telephone that Birda was vomiting; defendant told the husband to call again on the following day. On December 30, the husband telephoned defendant and stated that his wife was still vomiting and that "I think my wife is still pregnant and I like to have a report." Defendant stated that he would send a doctor "For more of a further diagnosis." A pregnancy test made on December 31 by a laboratory technician whom defendant sent to Birda's home showed a negative result.

On January 1, 1948, at the request of Birda's husband, defendant arranged by telephone to have an ambulance take her to a private hospital. Defendant suggested by telephone to Dr. Donohue, the physician and surgeon who took charge of Birda's case, that she was suffering from dehydration and intestinal influenza. Dr. Donohue's examination of Birda

[1]A summary of the testimony of the accomplice husband is separately stated, beginning on page 201.

disclosed, among other things, tenderness and distension of the lower abdomen and a brown, fetid, vaginal discharge; she was suffering from dehydration and her symptoms "could have been interpreted as intestinal flu." On January 2, Birda developed pelvic peritonitis which became constantly more severe despite massive doses of penicillin, which treatment was commenced some time after the "first 48 hours." The history of Birda's illness which her husband gave to Dr. Donohue was entirely different from the history given him by Birda herself and by defendant. Because Birda required blood transfusions which her family could not afford, she was transferred to the county hospital on January 12, 1948. Huge dosage of penicillin was there continued. Pelvic examination disclosed a "purulent, slightly bloody discharge" from the cervix; the cervix was soft, which "would indicate one of two things in her case, or both, either that she had been recently pregnant or that it was entirely the result of the inflammation and infection in the area." Despite treatment her condition grew worse.

On January 22 and again on January 23, 1948, Birda made the dying declaration that defendant "killed me." She died on the last mentioned date.

An autopsy disclosed that the uterus was "enlarged and soft. The external surface of the uterus did not show any obvious defect or any break in the contour but on cutting through the wall of the uterus there was a definite area of degeneration of tissue and the tissue at the top of the uterus has a necrosis which extended right down into the internal cavity of the uterus. . . It was indicative of probable trauma, probable mechanical interference with the uterus . . . [T]he lining of the internal cavity of the uterus was markedly congested, and fairly smooth except in the portion of the uterus at the top where that area of degeneration was, and there was also a little break in the lining there following the line of the degenerated tissue . . . The cervix and the vagina showed no evidence of any trauma other than severe congestion." Because of the degeneration of tissue in the fundal area of the uterus the autopsy surgeon "couldn't tell . . . whether there was a perforation to originally start it . . . [T]he appearance of the area of necrosis, and the arrangement of the necrosis in the tissue indicated that something has probably gone through the uterus there . . . There were not any obvious openings except for the degeneration within the tissue itself."

Dr. Grant, who examined and treated Birda in the county hospital, testified that in his opinion it would be "extremely unusual, almost impossible" to find a necrosis so situated in the uterus unless it was caused by "some instrumentation or foreign matter." According to defendant himself (who testified that he did not perform an abortion by instrumentation or otherwise) necrosis can be caused by "mechanical instrumentation, trauma, which is the most important one of them all, and of course, secondary is bacterial toxins."

Defendant testified to an innocent explanation of Birda's visits to him, of Johnson's communications with him, and of his arranging the two pregnancy tests and Birda's removal to a hospital. The trier of fact, however, was warranted in considering it significant that, according to defendant's testimony, the only record of Birda's case which he made contemporaneously with examining and treating her was a general history and diagnosis of possible chronic peritonitis made on her first visit on October 23, 1947, and that when police officers came to his office and accused him of aborting Birda defendant did not produce even this limited history of her case. A stirrup table and instruments which could have been used to perform abortions were found in the office of defendant.

The above recited evidence furnishes corroboration to the extent required by law (Pen. Code, § 1111) of the following testimony of the accomplice husband:

Prior to the events herein described Birda had been in good health. She was regularly employed. In October, 1947, she and her husband believed that she was pregnant. Johnson went to defendant's office and informed him that "my wife . . . didn't want to have this baby." Defendant agreed to perform an abortion on Birda for $250; he said that "he was good at it, he had did that lots of times." Defendant also told Johnson that "after he got my wife unpregnant, that he would give me a button to put up in her, and once a month she would have to come back and he would take that button out and wash it out for $5.00 each time . . . he told me that if I ever would have to carry her to the doctor, not to tell who put that button up in her." Johnson and Birda borrowed $250 from a bank to pay for the abortion. On October 22 (according to Johnson; October 23 according to other evidence), Birda went to defendant's office. Johnson telephoned the office and defendant told him, "She [Birda] is here now.

I am taking care of her now . . ., not to worry, that . . . everything would be all right." That evening Birda had a small amount of watery, reddish vaginal discharge. She was "kind of puny" and did not go to work for two days. Johnson talked with defendant by telephone from time to time. About 12 days after Birda's visit to defendant, Johnson, pursuant to defendant's instructions given over the telephone, removed a cotton pack from Birda's vagina; "a little bloody water was running out of her." The next day Johnson telephoned to defendant; defendant told him to bring a specimen of Birda's urine to defendant's office. This Johnson did. Defendant said that "he was going to send it off to some kind of laboratory to test it."

Birda "still didn't menstruate"; Johnson repeatedly— "so much I don't remember"—talked to defendant by telephone as to this; and about the middle of November defendant stated that he wanted Birda to come to his office in order that he could check her condition. Johnson also went to defendant's office and met Birda there. Defendant told them that "it would be about eight weeks before my wife started to menstruating normal like she should" and that a laboratory test had shown that she was not pregnant. Thereafter Johnson frequently communicated with defendant; on each of these occasions Johnson said that Birda had not menstruated, feared she was still pregnant, and did not want to have the baby. Defendant repeatedly assured Johnson that she would "come around" within a few weeks. On December 28, 1947, Johnson again reported to defendant, by telephone, that Birda believed she was still pregnant. Defendant said, "Have her come into the office in the morning about ten o'clock and I will check over and see what is the matter." On December 29, Johnson again telephoned defendant. Defendant said Birda "is here now." Johnson said, "whatever you do my wife don't want to have no baby." Defendant replied, "Don't worry, I will take care of it all right." That night when defendant came home he found his wife "flowing right smart," vomiting repeatedly and apparently very sick. He at once telephoned defendant, who said that she would be all right in two or three days; that "There was a clot at the tip of the womb and he opened her womb." Birda grew sicker. On December 30, when Johnson telephoned to report this to defendant, defendant said, "It just takes a little time . . . Trust me. . . . I know what I am doing." On December 31,

Johnson informed defendant by telephone that Birda's condition was still worse; defendant stated that he would send a doctor to see her. On January 1, 1948, Johnson visited defendant's office and told defendant that a physician who, at Johnson's request, had examined his wife would not treat her without a written release from defendant; defendant refused to give such a release. Johnson returned to his home and telephoned defendant that he planned to take Birda to a hospital. Defendant said that he would call an ambulance and would tell the hospital doctors ''what is the matter with her.'' The ambulance came promptly and Birda was taken to a private hospital. On January 2, 1948, Johnson telephoned defendant and defendant said ''not to worry, to keep quiet and not to be talking too much . . . Dr. Powell told me if anything happened they might put me in jail. . . He told me that every time I talked to him over the phone while my wife was so low sick, and he told me to keep quiet.'' Birda remained in the private hospital for 11 days, then, on January 12, was removed to the county hospital.

██ There must be a prima facie showing, by evidence independent of the above quoted extrajudicial admissions of defendant, of the corpus delicti; i. e., that there was injury of the sort forming the basis of the crimes and that the injury was caused by a criminal agency (*People* v. *Simonsen* (1895), 107 Cal. 345, 347 [40 P. 440] ; *People* v. *Jones* (1898), 123 Cal. 65, 68 [55 P. 698]) ; but the admissions may be considered in connection with the other evidence in determining whether all elements of the crimes have been established beyond a reasonable doubt (*People* v. *McMonigle* (1947), 29 Cal.2d 730, 738 [177 P.2d 745]). ██ Furthermore, the evidence of the admissions of defendant, since it came from an accomplice, must be corroborated (Pen. Code, § 1111) ; but the corroborative evidence need not of itself establish the guilt of defendant (*People* v. *Harper* (1945), 25 Cal.2d 862, 877 [156 P.2d 249]). ██ Defendant's contention that the evidence apart from the testimony of his admissions is insufficient to establish the corpus delicti is based upon an analysis which does not consider the evidence as a whole but points out the insufficiency of each bit of testimony considered alone. Viewed as a whole, resolving those circumstances which are capable of either an innocent or a guilty explanation to support the findings of the trial court, the evidence is sufficient.

 Defendant particularly complains that no physician was able to testify, solely upon the basis of an examination of Birda, and without taking into account hearsay statements of the accomplice husband, that Birda had undergone a septic abortion which caused her death. Dr. Grant, who examined and treated Birda at the county hospital, and the autopsy surgeon, testified that in their opinion her condition was caused by an abortion. Both these physicians testified, further, that there were other possible causes of her condition and that their opinions that the cause here was instrumentation of the uterus were based in part upon her case history, which included the statement of her husband that she had undergone an abortion. Dr. Donohue, who examined and treated Birda at the private hospital, testified that he formed an opinion as to the cause of the peritonitis from which she was suffering, but he did not testify to what this opinion was. We must assume that, when it developed that Dr. Grant's and the autopsy surgeon's opinions as to the cause of Birda's illness and death were based in part upon the history of her case given by her husband, the trier of fact took this into consideration and did not view the opinions as if they had been based solely upon the doctors' own knowledge. However, the trier of fact had before him competent, corroborated evidence from which he could draw the same conclusion that the doctors assumed from the husband's hearsay statement; i. e., that Birda had in fact undergone an abortion. Having so concluded the trier of fact could conclude further, guided by the doctors' expert testimony, that this abortion caused her sickness and death.

 The records of the county hospital concerning Birda were received in evidence over the objections that they contained hearsay and conclusions which were incompetent because not based upon the personal knowledge of the physicians who made the entries. In overruling the objections the trial court stated, "there perhaps will be hearsay testimony in there and due to the case being heard without a jury the court will only consider such testimony as is admissible . . . I may be letting in some evidence that is incompetent, but the court will not consider incompetent evidence." No specific objection to this procedure was interposed and it must be assumed that the court pursued its announced intention to consider only proper evidence. Under such circumstances it cannot be held that defendant has sustained the burden of affirmatively showing prejudicial error. The hospital records

include notations of the opinions of three physicians that Birda had undergone a septic abortion and was suffering from a perforated uterus. It is apparent that these opinions, like those of the physicians who testified, were based in part upon Birda's history as given by her husband, and defendant's principal objection to the admission of the hospital records is upon this ground. As in the case of the opinions given from the stand we must assume that the trial court did not consider these opinions as conclusions based solely upon the physicians' own knowledge; that it accepted the records for their correct evidentiary value; i. e., a detailed account of a deteriorating physical condition which was consistent with, but did not in itself constitute proof of, Birda's having undergone a septic abortion.

Death resulting from the commission of the felony of abortion is held in this state to be murder of the second degree. (*People* v. *Wright* (1914), 167 Cal. 1, 5 [138 P. 349]; *People* v. *Northcott* (1920), 45 Cal.App. 706, 709 [189 P. 704]; cases collected in 13 Cal.Jur., Homicide, § 19; see, also, Pike, Second Degree Murder in California (1936), 9 So.Cal. L.Rev. 112, 118-119.) Defendant urges that the trial court did not have "the power to render a verdict of manslaughter where the only evidence presented tended to indicate that the defendant was guilty of murder in the second degree or of no crime whatsoever—i. e., that he caused decedent's death by performing an unlawful abortion upon her or that he did not commit the abortion and decedent died of some other cause not the fault of defendant."

It cannot be doubted that a trier of fact has and often exercises the *power*, because of obvious extralegal factors or for no apparent reason, to find a defendant guilty of a lesser degree or class of crime than that shown by the evidence.[2]

Furthermore, even if it be assumed that the trier of fact erred here when he found defendant guilty only of manslaughter, defendant cannot invoke reversal on an error which is favorable to him. (See Code Civ. Proc., § 475; 2 Cal.Jur.,

---

[2]See *People* v. *Lem You* (1893), 97 Cal. 224, 228 [32 P. 11]; quoted in *People* v. *Macken* (1939), 32 Cal.App.2d 31, 41 [89 P.2d 173]: "Of course, a jury, in rendering a general verdict in a criminal case, necessarily has the naked *power* to decide all the questions arising on the general issue of not guilty; but it only has the right to find the facts, and apply to them the law as given by the court." See, also, the discussion by Pike, Second Degree Murder in California, *supra*, pages 128-132 of 9 Southern California Law Review, of probable extralegal causes for verdicts of second degree murder in California cases.

Appeal and Error, §§ 493, 595; 8 Cal.Jur., Criminal Law, § 562.) ▮ An appellant is precluded from complaining that he was convicted of a lesser offense than the one of which he is guilty according to undisputed evidence, or according to that view of the evidence which, it indisputably appears, the trier of fact accepted. (*People* v. *Barnhart* (1881), 59 Cal. 381, 384; *People* v. *Maroney* (1895), 109 Cal. 277, 279 [141 P. 1097]; *People* v. *Muhlner* (1896), 115 Cal. 303, 305 [47 P. 128]; *People* v. *Glab* (1936), 15 Cal.App.2d 120, 122 [59 P.2d 195]; *People* v. *Blackwood* (1939), 35 Cal.App.2d 728, 733 [96 P.2d 982]; other cases stating this rule are collected in 13 Cal.Jur., Homicide, § 64.)

Defendant relies upon *People* v. *Huntington* (1903), 138 Cal. 261 [70 P. 284] (conviction of manslaughter reversed because the trial judge of his own motion instructed the jury as to manslaughter although the evidence showed either second degree murder in the commission of an abortion or, as defendant claimed, that he did not know deceased was pregnant, did not intend to abort her, and she died, probably from the effects of an anaesthetic, while undergoing a lawful surgical operation), and *People* v. *Kelley* (1914), 24 Cal.App. 54 [140 P. 302] (conviction of manslaughter reversed because the trial judge instructed the jury as to involuntary manslaughter where the evidence showed only an intentional killing, either in self-defense or with malice aforethought). Each of these decisions rests upon the undoubtedly correct rule that it is error to give instructions which have no application to the case at hand; in each it was determined that, in the circumstances, the giving of the inapplicable instruction was ground for reversal. (It may be noted, also, that each was decided before the adoption of section 4½ of article VI of the California Constitution, which requires that a conviction not be set aside on the ground of misdirection of the jury unless, after an examination of the entire cause, the court is of the opinion that the error resulted in a miscarriage of justice.) In *People* v. *Long* (1940), 15 Cal.2d 590, 603 [103 P.2d 969], also relied upon by defendant, this court said, "we do not have to decide now whether in a case [of asserted murder by abortion] where no evidence of lack of due caution and circumspection is offered and received, a manslaughter verdict can be supported solely on murder evidence, or whether, in such a case, it is reversible error to instruct on manslaughter." The express reservation in the Long case of the first stated question does not, in our opinion, indicate that this court was

then disposed to depart from the settled rule of the cases cited *supra,* page 206, recognized in the Kelley case, *supra,*[3] that a conviction of an offense less than that which the evidence shows is, in the absence of a showing of prejudice, error favorable to defendant of which he cannot complain.

Defendant here relies also upon the reasoning of a note in 14 Southern California Law Review 189. This note, like the Huntington and Kelley cases, *supra,* concerns the effect of instructing a jury as to a crime less than that shown by the evidence. It is said (p. 191 of 14 So.Cal.L.Rev.) that "Instead of the defendant being fortunate to be convicted of the lesser crime it may well be that he would not have been convicted at all" if the inapplicable instruction had not been given; because of such instruction the jury may convict of the lesser offense where they are "almost, but not quite sufficiently, convinced" of the defendant's guilt of the greater offense which the evidence tends to show, or where they are "prejudiced against him in such a way that they desire to convict him of some crime but would not go so far as to inflict upon him the penalty for murder." The same reasoning, defendant urges, applies here, where the case was tried without a jury; the trial court, suspicious but not convinced of defendant's guilt, indulged in an improper compromise by finding him guilty of a lesser offense not shown by the evidence. We are of the opinion that we are not warranted, where, as here, the reason for the trial court's finding of manslaughter is not apparent, in seizing upon the explanation that the court deliberately found defendant guilty of manslaughter although it was not convinced beyond a reasonable doubt that he was guilty of any criminal homicide, rather than accepting one of the equally possible and far more probable explanations that the trial court, because of what technically may be extralegal considerations, such as mercy, tempered the harsh application of the law, or that, bearing the rigorous burdens of the trial process, he overlooked the cases which have decided that one who causes death by commission of a criminal abortion is guilty of second degree murder, not manslaughter.

---

[3]Ordinarily "a party will not be heard in an objection to a verdict of manslaughter against him under an indictment for murder where it appears that, under the evidence, he in justness ought to have been convicted of the crime of murder . . ., the theory of that proposition being that there can in reason be no just cause of complaint by the defendant where the verdict is more favorable to him than is perhaps justified by the evidence" (p. 61 of 24 Cal.App.).

■ Finally, defendant urges that his conviction upon count one (abortion) cannot stand because the offense was allegedly committed "on or about October 23, 1947," whereas if there was any sufficient evidence of an abortion it was of an offense committed on December 29, 1947. As we have seen, there was sufficient corroboration of the accomplice's testimony, under the rule of section 1111 of the Penal Code as applied by the cases, to support a finding that defendant committed an abortion on December 29. Defendant argues that the People, at the trial, should have elected the date upon which they proposed to prove the crime of abortion. However, he did not, at the trial, request that the People so elect, and the situation in this respect appears to be like that in *People* v. *Williams* (1945), 27 Cal.2d 220, 226 [163 P.2d 692] : "[I]n preparing his defense defendant was in nowise prejudiced by the alleged variance. Nor can he successfully maintain that he may be placed in jeopardy again for the same offense. It is well settled that on a plea of double jeopardy [or former conviction], extrinsic evidence is admissible on the trial to identify the crime of which defendant has been convicted. [Citations.]"

Since no miscarriage of justice appears, the judgments, one more favorable to defendant than the view of the evidence taken by the trial court could support, should stand.

For the reasons above stated, the judgments and order appealed from are affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.