[Crim. No. 5785. Second Dist., Div. Two. May 21, 1957.]

THE PEOPLE, Respondent, v. ROBERT E. WILLIAMS, Appellant.

*Assigned by Chairman of Judicial Council.

Gladys Towles Root, Eugene V. McPherson and Joseph A. Armstrong for Appellant.

Edmund G. Brown, Attorney General, and Henry K. Workman, Deputy Attorney General, for Respondent.

ASHBURN, J.—Defendant, having been convicted of first degree murder with recommendation of punishment by imprisonment in the state prison for life and having been sentenced accordingly, appeals from the judgment. Counsel make three claims of error warranting a reversal, (1) that the evidence is insufficient to sustain a conviction of murder, (2) that it is insufficient to establish murder in the first degree, and (3) that prejudicial error was committed in the exclusion of declarations of defendant which contradicted his confessions.

The guiding rule of review is stated in *People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778] : " ' [B]efore the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground' of insufficiency of the evidence, 'it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. The determination of a charge in a criminal case involves proof of two distinct propositions: First, that the offense charged was committed, and second, that it was perpetrated by the person or persons accused thereof. . . . We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.' If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury.''

Essentially the argument in support of appellant's first claim is that there is nothing to connect defendant with the

crime except his own statements, and that they are unreliable because he was proved by expert testimony to be a pathological liar. The second claim is that, as the first degree murder finding must rest upon a showing that the homicide was committed during the perpetration of a robbery, there must be independent proof of the robbery as a part of the corpus delicti and that there is no such evidence here except defendant's confessions.

■ Proof of the corpus delicti in a murder case "consists of two elements, the death of the alleged victim[s] and the existence of some criminal agency as the cause, either or both of which may be proved circumstantially or inferentially. . . . ■ Proof of the corpus delicti does not require identity of the perpetrators. It is not necessary that it connect the defendant with the commission of the crime although it may do so. . . . ■ It is the settled rule, however, that the corpus delicti must be established independently of admissions of the defendant. Conviction cannot be had on his extrajudicial admissions or confessions without proof *aliunde* of the corpus delicti; but full proof of the body of the crime, sufficient to convince the jury of its conclusive character, is not necessary before the admissions may be received. ■ A prima facie showing that the alleged victim[s] met death by a criminal agency is all that is required. The defendant's extrajudicial statements are then admissible, the order of proof being discretionary, and together with the prima facie showing must satisfy the jury beyond a reasonable doubt." (*People* v. *Cullen*, 37 Cal.2d 614, 624-625 [234 P.2d 1].) Accord: *People* v. *Amaya*, 40 Cal.2d 70, 75-76 [251 P.2d 324]; *People* v. *Cobb*, 45 Cal.2d 158, 161 [287 P.2d 752].

■ Where the homicide is committed in the course of a robbery it is not necessary for the prosecution to prove the fact of robbery as part of the corpus delicti; the degree of the crime is not part thereof; it may be proved by defendant's own statements after a prima facie showing of homicide has been made by other proof. "In this connection, Miller apparently contends that the prosecution was bound to establish by independent evidence the corpus delicti of the crime of attempted robbery, as well as the corpus delicti of the crime of murder, before his extrajudicial statements concerning the planning and execution of the attempted robbery could be used to prove the degree of the murder which was admittedly committed. He cites no authority to sustain his contention, and it appears to be without merit. The corpus delicti of the

crime of murder having been established by independent evidence, both reason and authority indicate that the circumstances surrounding the commission of the crime can be shown by the extrajudicial statements of the accused, and that such evidence of the surrounding circumstances may be used to establish the degree of the crime committed." (*People* v. *Miller*, 37 Cal.2d 801, 806 [236 P.2d 137].) See also *People* v. *Amaya, supra*, 40 Cal.2d 70, 80.

The evidence, viewed in the light of the rule of the Newland case, *supra*, establishes independently of defendant's own extrajudicial statements the following facts. Matt Manestar, the victim of the crime, was the owner of Rose Motel, located at 1345 West Pacific Coast Highway, in the Wilmington or Harbor City area. He was "well-to-do," and locally was reputed to have "quite a bit of money." One of his sons testified that "[w]e were asked about it quite a few times. . . . on the dock . . . they kept calling us money bags." On the night of January 22-23, 1956, Matt Manestar was in charge of the office or lobby of the motel; he had relieved his son Leonard at about 12:45 a. m. on the 23d, a Monday; he was alone at the time. In one of the drawers of a table in the office was currency amounting to $27; in a box on the counter were some small coins for use for television. On the preceding Saturday $30 in currency had been delivered to Mr. Manestar. At 10 a. m. on Monday, the 23d, another son, Emil, arrived at the office. No member of the family had seen Matt after Leonard left him and before Emil arrived. He found the doors unlocked, the lights on; Matt's hat, coat and glasses were on the counter; the table drawer was partially open and the $27 of currency was gone; the coin box had also disappeared. There was no evidence of a struggle.

On January 25th, about 4 p. m., Officer Schmitz of the Los Angeles Police Department saw Matt's body on a ledge of a cliff about 75 feet below the road near Point Firmin Park, several miles from the motel. There were no shoes, hat or glasses on the body. No automobile or other form of conveyance was near. An autopsy disclosed that the cause of death "was gunshot wound in the head and of the abdomen with hemorrhage and injuries to the brain." Also: "The point of entrance was in the left occipital region, which is back of the head on the left side. The bullet pierced the brain more or less diagonally and edged through the right eyelid. . . . The other wound was in the region of the abdomen, rather closely between the edge of the ribs and I think a little to the right,

two or three inches to the right of the mid-line, being in this position (indicating). That bullet lodged posteriorly toward the back and had gone through the right lung and terminated under the skin of the back, from which point a bullet was recovered and saved." The police were unable to discover any clue to the identity of the criminal until they talked with defendant on April 17th.

There can be no doubt that the foregoing makes a prima facie showing of homicide. Of course, that is enough to afford a basis for the use of defendant's confirmatory confessions. (*People* v. *Cullen, supra,* 37 Cal.2d 614, 624; *People* v. *Powell,* 34 Cal.2d 196, 203 [208 P.2d 974].) ▮ "To prove a *prima facie* case of *corpus delicti,* all that was required was to show a reasonable probability that a criminal act of another had been the direct cause of the death. . . ." (*People* v. *Ives,* 17 Cal.2d 459, 464 [110 P.2d 408].) In *People* v. *Mehaffey,* 32 Cal.2d 535, 545 [197 P.2d 12], the court, speaking of the use of extrajudicial declarations and statements of a defendant, said: "[I]t is likewise well settled that to authorize their reception in evidence and consideration by the jury, the prosecution is not required to establish the corpus delicti by proof as clear and convincing as is necessary to establish the fact of guilt; rather slight or prima facie proof is sufficient for such purpose. [Citations.] It may be proved by circumstantial evidence and by inferences reasonably drawn therefrom. [Citations.] Direct or positive evidence is not essential [citations], nor is it necessary at this point to connect the defendant with the perpetration of the offense."

The possibility that decedent voluntarily walked or rode from the motel to the edge of the cliff several miles away, there shot himself and fell over the cliff was not suggested by anything in evidence. ▮ A mere possibility affords no evidence whatever. (See *Robinson* v. *Board of Retirement,* 140 Cal.App.2d 115, 118 [294 P.2d 724], and authorities therein cited.) The reasonable inference is death by violence. Basis is thus afforded for use of defendant's confessions for completion of the proof.

Defendant made two written and signed confessions, another which was taken down on a tape recorder, and numerous other oral statements pointing to himself as the perpetrator of a robbery resulting in the killing of Manestar.

On March 30, 1956, defendant, who apparently had been on parole from the Deuel Vocational Institution at Tracy, was returned for some infraction of rules not connected with this

case. Within a week he went to Ralph R. Enos, an officer of the Guidance Center, essentially a counselor, and asked about getting or seeing an attorney. He was advised that ordinarily attorneys were not available to inmates of that institution but that Enos would see what he could find out. Shortly thereafter defendant again asked about an attorney and was told by Enos that he had inquired but had not been able to get an immediate answer. He asked defendant if there was something that he would feel free to tell that would concern an attorney, and defendant then said that he had been in some other trouble in addition to that which caused his return to Deuel and that "I will admit a robbery." He added that on January 24, 1956, at about 3:30 a. m. he robbed a motel at 1345 West Pacific Coast Highway in Harbor City. Enos then asked, "Well, was there something else?" and defendant said, "Well, there was a body at the bottom of the cliff." On April 9th defendant inquired again about the matter of an attorney, was told that nothing had been heard from a letter written by Enos. In one of these conversations defendant stated "that he wanted to get it off his conscience to ease his feelings about this. This was something that troubled him and he wanted to get it off his chest to relieve his feelings in the matter. . . . I asked the question if there was anyone else involved and he said there was but he did not identify the person." Enos reported the matter to the Los Angeles sheriff's office.

Roy T. Asakawa, correction officer at Deuel, was sought out by defendant after his talks with Enos and before arrival of the Los Angeles officers, which was on April 17th. Defendant told him that he would like to confess a crime that he had committed in Los Angeles and that he had already talked to Mr. Enos. "He said that on January 24th of this year he had shot a man in Los Angeles; that him and a friend were riding around one night and they robbed a motel and his friend drove the car while Williams went inside the motel. He went inside and stuck up the motel and then he ordered the man outside. He said he didn't know why, but he did, and he put the man in the front seat of the car while he got in the back seat. Then he told his buddy to drive around out to the cliff somewhere, and he said all the time that they were riding he kept telling the man in the front seat how they were going to kill him, just to see what his reactions were. I asked him what he did after that, and he said they kept threatening the man, and about 45 minutes later or so, the man

made a grab for the wheel and, 'I shot him. I shot him in the back of the head.' I asked him what he did with the gun and he said he couldn't tell me. I asked him about his accomplice and he said as long as they didn't have the gun, or his accomplice, that they couldn't do a thing to him. He said that no one would ever find the gun.''

Upon arrival of Officers Butts and Weyant of the Los Angeles Police Department, defendant at first refused to talk to them, insisted on talking first to Asakawa, who said, ''he talked to me mostly about what kind of a sentence that I thought he would get. He was afraid about getting the death penalty and I told him in my opinion he was pretty young and that they probably would look at his age and he didn't have too much to worry about that on the death penalty, but that seemed to be his only concern about the matter, getting the death penalty. He appeared to be awfully nervous.''[1] Defendant then talked with Capt. Hawker, who was in charge of the Custodian Force of the institution. This occurred in the presence of Asakawa. The talk was along the same lines as that just had with him and defendant asked Hawker what he thought a jury would do to him. The Captain told him he could not say but ''if he did it, to go ahead and confess it to get it off his chest. He said he couldn't tell him one way or the other.''

Then defendant talked to Officers Butts and Weyant. Before he was told what they wanted ''he asked us what we were trying to do, put him in the gas chamber? And he said that he could cop out to a robbery, but nothing else.'' Before this conversation began the police had no idea how the crime had been committed, and made it a point not to suggest to the defendant any particular phase of the crime. They did not even mention the word ''murder'' until after he was well into the story of the crime itself. Defendant made an oral confession and repeated it as Weyant wrote it down in defendant's own words. It was then signed by him. There is no claim that it was not voluntary. That confession, in summary, says that defendant, on Sunday, had bought three guns, one a .38 revolver; that evening he and a friend (whom he refused

---

[1]The record does not disclose defendant's age, but several references to his youth appear therein. The Deuel Institution exists ''to provide custody, care, industrial, vocational and other training, guidance and reformatory help for young men, too mature to be benefited by the programs of correctional schools for juveniles and too immature in crime for confinement in prisons.'' (Pen. Code, § 2036.) It is a fair inference that defendant is in his early twenties.

to name) "got some weed," bought some Gallo wine and drove around smoking the weed and drinking. He had the .38 gun and his friend a .32, both loaded. The friend was driving and defendant told him to go down Highway 101 toward Lomita; he had heard about "this guy" in a motel having a lot of money there; he was supposed to be a Yugoslav. They decided to put him in the car, take him into the hills and "drop him off, so he couldn't call the heat on us." Defendant went into the office and the victim was sitting back of the counter about half asleep. Defendant pointed the gun at him, said he wanted his money, and "not to give me any static because I know you have more than just the motel money;" Manestar took the money from the drawer and handed it to defendant. "He kind of stuttered and I threatened him with the gun." The police knew nothing of Manestar's tendency to stutter when excited; they later learned the fact. Told to walk out to the car just like everything was all right, Manestar did so, was put in the front seat and defendant got into the rear. They drove into the hills. "We started telling him we were going to kill him if he didn't tell us where the money was. I had no intention of killing him, just trying to scare him and I was hopped up on weed and Gallo wine. We were arguing and laughing more or less cutting up. I think the guy grabbed for the wheel. My gun went off hitting him in the head somewhere. Blood splattered all over. He fell forward towards the dashboard. We stopped for a second, then my partner said let's get him out of here. I and my partner had gotten out of the car. I wiped some blood off my shoulder, then I went through his pockets. All I took was some blue chips, three or four. I thought they were quarters at first, a fountain pen and a little round ring I think there were keys on them. I threw them away right there. We got back in the car. I don't think I shot him again. I don't remember if I did. I don't remember. I actually don't remember what happened after that." (The police when at Tracy knew nothing of the poker chips; Emil Manestar had seen them in the office about two days before the father's disappearance.) Upon return to his hotel room defendant found that he and his friend had taken $47 and they split it. There were two or three five dollar bills, one ten, and some ones. Leonard had noted that he turned over to his father a ten dollar bill, two fives and seven ones; the father had received from a little girl on Saturday three ten dollar bills. Defendant said he gave the .38 and the .32 to a friend the next day but he declined to name that person.

In writing down the confession Officer Weyant drew a diagram of the motel office under defendant's directions, locating the door, the walls and each object as specified by him. They were thus put in their proper places without any suggestion from Weyant. This included the place where the victim was sitting, the table from which the money was taken and the color of the divan which defendant correctly said was green. He did not recall the desk under the front window. He said he took no money from the desk or the box on it.

The police took defendant from Deuel to San Pedro on April 20th. On the way defendant asked what they were taking him to Los Angeles for, was told that it was an investigation of the killing of "this motel man," and defendant replied, "you got the wrong man on that, sir." The conversation was sporadic, but as Officer Butts testified: "Then all of a sudden he might ask me, like he did several times, about that statement that he had signed at Tracy. He wanted to know if that amounted to a confession and I told him that in my opinion that the statement that he had signed had all the elements of the case in it and did amount to a confession."

That night at the police station Butts showed defendant a picture of the Manestar family group and a small one of Matt Manestar and asked if that was the man he robbed. The reply was that the small one "looks like the man."

That same evening a further interview was had and a tape recording made. Defendant again talked voluntarily and freely. Among other things he pointed on his own body to the places where the bullets went through the head and the torso. When explaining the latter wound he testified that he just had the victim by one hand, trying to hold him up, that he was falling and defendant shot him "[r]ight in here or the guts. Q. You mean in the guts or upper chest or the lower chest? A. Right in the area."

On May 1st defendant made an oral confession. Though it differs in certain respects from the first one—e.g., substituting Carpenter for Caprell as an accomplice—he again told of the weed and the wine, the robbery inside the motel office, marching the victim to the car, driving into the hills, the attempted grabbing for the wheel, the shooting of the victim, searching him, finding a ring of keys, a few chips, a pen, and nothing else. "He said he shot him the second time when he was searching him. The gun went off accidentally. This was before driving down to the point. And he stated then they

drove down to the point and got out of the car and Bob said he got hold of the man's feet and Jimmie got hold of the man's arms and they threw him over the cliff.'' Defendant also said he got $47 in the robbery.

On May 2nd at the police station defendant said all his previous stories were false; that he knew only what he had read in the San Pedro and Wilmington newspapers while at Tracy. But the transcription of the recording of April 20 contains this: ''Q. By OFFICER BUTTS: Did you read about it in the paper? A. No. The only part that I read in the paper, well, I heard about it, you know. He showed me a clipping of it, Frank showed me a clipping of it, and then when I got to Tracy there was a clipping. But the only clipping I had in Tracy, where he was kidnapped and vanished. Q. Where he was missing? A. Yah. Q. Before he had been found? A. Yah.'' In a second conversation in the district attorney's office on the second of May defendant again asserted that all he knew about the crime was what he read in the newspapers. But, after being quizzed as to how he knew certain things, he said: ''All right, that is not the truth. I actually was in on the robbery. . . . He stated that the way he had told us about the robbery and kidnaping and shooting happened was all true; that it happened that way, except that he was by himself. He had pulled the job by himself; that he went over to the motel and walked into the office and found the man as he described him; that he had taken him out to the hills to keep him from calling the police, and had parked the car and started to search the man. He started to walk away from him and he got scared and shot him and he said he thought the man was going to get away from him. He said after shooting him he then walked up and shot him again to make sure that he was dead. He dragged the body over and threw it over the cliff himself.'' This was followed by written confession of the same date, May 2nd, which defendant volunteered to write in his own hand. It differed from the first one in numerous particulars but contained an admission of the robbery and the homicide. The description of the robbery was substantially the same as before except that it was a one-man job; in the hills defendant ordered Manestar out of the car; ''I went to look in his pockets and he turns and began to leave; the gun went off hitting him in back of the head or neck. I then went over and started going through his pockets real fast. I found a pen and a key set and some chips. I threw the keys and put the pen and chips in my coat. Then as I went to push him off right there

where the cliff was the gun went off again. The first time was because I was scared, the second time it went off by mistake. I was holding him and pushed him over." This document concludes: "I told a lot of stories to cover up for my brother's car and all the reason I named these other people was because I knew they had nothing to worry about, this is final and at last the whole truth and am glad." Then follows the signature.

There were numerous other statements made by defendant from time to time which were contradictory of his confessions, just as there was inconsistency between the confessions themselves, but those things presented problems for the jury to solve by drawing the more reasonable inferences. ██ "The prosecution is not bound by the exculpatory statements or self-serving declarations in a confession when shown by direct or circumstantial evidence to be untrue. . . . ██ Moreover, confessions stand upon the same footing as other evidence and are to be weighed by the jury in the same manner. All parts are not necessarily entitled to the same credit, and the jury may believe a part and reject the remainder of a confession (*People* v. *Wyman,* 15 Cal. 70, 74; 8 Cal.Jur. 119, § 207)." (*People* v. *Garcia,* 2 Cal.2d 673, 679 [42 P.2d 1013].)

██ "There are some discrepancies between details of the confession and other proof, but that goes to the weight, not the competency, of the confession." (*People* v. *Wade,* 138 Cal.App.2d 531, 536 [292 P.2d 303].)

██ But appellant argues that the confessions should have been rejected as untrustworthy because he was proved to be a pathological liar and a psychopathic personality. For this he relies upon the testimony of an expert. As a partial basis for that testimony defendant's mother testified to childhood illnesses, head injuries and a penchant for telling mean and ugly things which he had done, which proved to be untrue; exemplified by the claim that he had "stomped" a boy in the stomach and knocked him out; another that he was involved in a murder case in Texas when in fact he was being held for vagrancy. Defendant's brother testified to his inclination to tell "tall tales," such as beating up another person with whom he had had no fight in fact; also illustrated by his claim that he had had a fight with Officers Thornberry and Butts, and that he had told many other false tales. Any evidence of facts indicating a congenital or pathological inability or disinclination to tell the truth was received when offered.

The expert, an experienced psychiatrist, had been told by defendant's attorney that he thought defendant possibly had confessed to something he did not do, and the witness started his examination of defendant with the feeling that anything defendant had told the police officer in the nature of a confession was untrue; that he had falsely confessed to a crime. This witness, who relied upon undisclosed conversations with other persons and reports made by them, expressed the opinion that defendant "is a psychopathic personality with a pathological line," who, actuated by hidden and unrecognized motives, would be likely to make a false confession of crime, motivated by desire for publicity, a craving to look big to his associates, to play the role of an important person, a wish to cause trouble and frustration to officials working on the case, or to worry and harass people who care about him and thus excite their pity, or for other esoteric reasons would thus assume the temporary burden of a crime he had not committed. This expert testified that hardly anything defendant says is reliable, but he conceded that he did not know whether it was true or false when defendant denied his guilt, and he would not say that defendant is incapable of telling the truth about anything.

It is significant that defendant in his first conversation with Mr. Enos gave the exact address of the motel, 1345 West Pacific Coast Highway; in his first confession to Officers Butts and Weyant he spoke of using a .38 revolver and the bullet found in Manestar's body came from a .38; he said Manestar "kind of stuttered," a fact unknown to the police; told of the poker chips, which were unknown to the officers; gave details of the Manestar office from which Weyant made an accurate diagram in his presence; later pointed to the places on the head and body where the victim was shot. The expert answered in the affirmative this question: "If this defendant described things about this crime he could not have gained from any source excepting having seen it or been there, then you would say that he would be telling the truth on that, would you not, if it was accurate?"

Again: "I will put the question to you this way: If the defendant did commit the murder there is nothing about the thing that you diagnosed here that would prevent him or render him incapable of accurately narrating the circumstances of the killing, would there? A. No, there isn't. Q. He would be perfectly capable of doing that, would he not? A. Yes, he would be capable of it." Finally: "Q. Secondly, you do not purport to say here, Doctor, whether or not the

defendant told the truth on any given occasion or did not tell the truth on any given occasion? A. No, I don't purport to say that. I purport to say that his statements are unreliable on every occasion. Q. Unreliable, but you do not purport to say that anything he says could be true? A. No, I don't purport to say that.''

Counsel argue that this was the only expert evidence on the subject and hence cannot be rejected; from this predicate they conclude that defendant's confessions are unreliable to the point where they must be rejected and that the State is therefore left without any evidence connecting defendant with the crime. There are two answers to this contention. ▆▆ Firstly, the expert's testimony leaves a field open to conflicting inferences, and it was the province of the jury to resolve that conflict. (See *People* v. *Berry,* 44 Cal.2d 426, 432 [282 P.2d 861]; *People* v. *Martin,* 87 Cal.App.2d 581, 584 [197 P.2d 379]; *People* v. *Loop,* 127 Cal.App.2d 786, 800 [274 P.2d 885].) Secondly, this is not one of those occasions so familiar in malpractice actions (see *Lawless* v. *Calaway,* 24 Cal.2d 81, 86 [147 P.2d 604]) where expert opinion is binding upon judge and jury. It is rather one of those situations in which the expert's conclusions are to be weighed in the light of the reasons assigned therefor and the other facts in evidence. (Pen. Code, § 1127b; *People* v. *Long,* 15 Cal.2d 590, 606-607 [103 P.2d 969]; *People* v. *French,* 12 Cal.2d 720, 763 [87 P.2d 1014]; *People* v. *Denningham,* 82 Cal.App. 2d 117, 119-120 [185 P.2d 614]; *People* v. *DeMordaigle,* 138 Cal.App.2d 435, 440 [292 P.2d 3]; 20 Am.Jur. § 1208, p. 1059; 32 C.J.S. § 569a, pp. 390, 391; § 569c, p. 396.) ▆▆ The jurors well may have concluded that the original confession emanated from a sense of guilt and a nagging conscience, fortified perhaps by a belief that ''as long as they didn't have the gun, or his accomplice, that they couldn't do a thing to him.'' We conclude that evidence of substantiality supports the implied findings that defendant committed the homicide and did so in the perpetration of a robbery.

▆▆ Counsel for appellant also assert error in the exclusion of proffered evidence ''of other confessions and statements of appellant concerning the matter at issue,'' saying, ''[t]he appellant wished to show that the other statements were inconsistent with the confessions offered by the prosecution as going to appellant's mental traits and the validity of the introduced confessions.''

Officer Weyant was the first witness concerning defendant's

confession, the one of April 17th. During his cross-examination he was asked whether he had had any further discussion with the defendant "wherein he confessed." He replied in the affirmative and was then asked, "[w]ould you relate those confessions?" Objection being made, defendant's attorney defined his purpose as having the prosecution confession's "validity repudiated on the basis of the other confessions." He also said: "I think that the jury has a right to be able to take those other confessions into consideration in determining whether this particular confession is valid. . . . We are concerned with the validity of the confession. I repeat that that is the main issue in this case, and if you don't allow the other evidence, the other confessions in, we are not allowing evidence on the only important issue in the whole case." The prosecutor's objections were sustained. Following that ruling Officer Butts, called as a defense witness, testified he was present when the Deuel confession of April 17th and the tape recording of April 20th were made, said he had other conversations with defendant and was asked: "And did he make any confessions at any of those times?" Objection being made, defense counsel asserted: "Your Honor, the other confessions involved here go to the validity of the confession that was introduced into evidence. The books are full of cases that the defendant can later introduce evidence of confessions, and I am trying to introduce this confession in rebuttal in showing that the confession is inconsistent." Again, "I think we have a point here. The last confession that was made was a written confession, written and signed entirely in the defendant's own handwriting. One of them, not the last one, but the first one was written by the police officer and the last one was written by the defendant himself, written and signed in his own handwriting. If any confession is entitled to credibility, or to believability, that should be the one that is admissible." The court having indicated a contrary ruling would be made, counsel then said: "Well, I will have to put him on the stand," referring to defendant. Clearly, the import of counsel's arguments was that inconsistent statements (confessions) of defendant would disprove the one introduced by the State and that they were competent for that purpose. The ruling was correct.

Fricke on California Criminal Evidence, third edition, page 67: "The confession of a defendant is admissible only as evidence when offered by the prosecution and, when such a statement made by the defendant is offered in his behalf it is objectionable as being hearsay and self-serving and is inad-

missible." Such was the holding in *State* v. *Jones*, 47 La. 1524 [18 So. 515, 518], and *State* v. *Mattio*, 212 La. 284 [31 So.2d 801]. In the last cited case it is said at page 808 [31 So.2d]: "While appellant's statement in the instant case contained certain admissions of inculpatory facts it was basically exculpatory. It disclosed no criminal intent and recited no admission of guilt; it amounted to nothing more than a self-serving declaration, inadmissible in evidence when offered in the accused's behalf, as the trial court correctly ruled. Undoubtedly the principal reason for denying a defendant the right to introduce in evidence his exculpatory declaration is that if he were permitted to do so he would be presenting his testimony to the jury without taking the witness stand and without running the risk of impeachment on cross-examination." (See also 22 C.J.S. § 842, p. 1478.)

It is now said that one of the purposes of the proffered contradictory statements was "going to appellant's mental traits." This does not square with the record, as is shown by the above quotations from counsel's remarks.

After the ruling was made the court received without objection various self-serving declarations of defendant, such as a letter and oral statements to his friend Toby Moody, and a statement to his mother concerning the case. The prosecution also reopened its case in chief, proved defendant's oral denials of guilt on April 21st and on May 2nd, his statement on the 21st that he was taking the rap for someone else and for a consideration of $5,000, and his written confession of May 2nd which contradicts in some respects the original one of April 17th.

Appellant's counsel did not make any offer of proof and it is impossible to determine from the transcript or the briefs what specific evidence he had that was not actually received. He is now in no position to complain. (*People* v. *Harris*, 169 Cal. 53, 63-64 [145 P. 520]; *People* v. *Danielly*, 33 Cal.2d 362, 376 [202 P.2d 18].)

Defendant was not called to the witness stand. While this fact alone could not fill any hiatus in the proof of the prosecution, it nevertheless lends weight to evidence presented by the State upon matters presumptively within defendant's knowledge and which, if untruly stated, would normally be denied by him. (See *People* v. *Adamson*, 27 Cal.2d 478, 489-490 [165 P.2d 3]; *People* v. *Ashley*, 42 Cal.2d 246, 268 [267 P.2d 271]; *People* v. *Goldstein*, 136 Cal.App.2d 778, 790 [289 P.2d 581].)

Defendant's voluntary confessions, considered in connection with the independent proof of the corpus delicti, leave little room for reasonable doubt of his guilt. Three Wigmore on Evidence, third edition, section 866, page 357, says this: "(1) Now, assuming the making of a confession to be a completely proved fact—its authenticity beyond question and conceded,—then it is certainly true that we have before us the highest sort of evidence. The confession of a crime is usually as much against a man's permanent interests as anything well can be; and, in Mr. Starkie's phrase, no innocent man can be supposed ordinarily to be willing to risk life, liberty, or property by a false confession. Assuming the confession as an undoubted fact, it carries a persuasion which nothing else does, because a fundamental instinct of human nature teaches each one of us its significance."

There appears to have been no miscarriage of justice in the instant case.

Judgment affirmed.

Moore, P. J., and Richards, J. pro tem,* concurred.

*Assigned by Chairman of Judicial Council.