[Crim. No. 8133. Second Dist., Div. Four. July 25, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. LUCIANO EDWARD LUPORINI, Defendant and Appellant.

Mydland & Pic'l and Dean R. Pic'l for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and George J. Roth, Deputy Attorney General, for Plaintiff and Respondent.

JEFFERSON, J.—An information filed by the District Attorney of Los Angeles County charged defendant with the commission of three felonies: Count I, assault with intent to commit murder in violation of section 217 of the Penal Code; Count II, assault by means of force likely to produce great bodily injury in violation of section 245 of Penal Code; and Count III, infliction of cruel and inhuman corporal punishment and injury, resulting in a traumatic condition, upon a child in violation of section 273d of the Penal Code. Defendant entered a plea of not guilty. Trial by jury was duly waived by defendant personally and all counsel. The trial court found defendant not guilty of Counts I and III, but guilty of Count II, assault by means of force likely to produce great bodily injury. Probation was denied, and defendant was sentenced to state prison for the term prescribed by law. This is an appeal from the judgment and order denying motion for new trial.

Christina Maria Luporini, an infant born on April 17, 1961, was admitted to Los Angeles Children's Hospital on May 29, 1961, with severe injuries which included: a subdural hematoma, a subarachnoid hemorrhage resulting in permanent brain damage, chip fracture of the femur, 20 fractures of the rib cage, and numerous marks of discoloration on the body. Although there was medical testimony of either spontaneous causation of the head injuries due to a weak vascular structure or traumatic injuries sustained at childbirth, there was substantial evidence offered by expert medical opinion to warrant a finding by the trier of fact that these injuries were caused by an external traumatic force. Doctors estimated that the head injury which caused internal bleeding occurred 24 to 72 hours before May 29, 1961. A radiologist stated that in his opinion the fractures of the ribs took place about two weeks before May 29, 1961. This estimate was based on the degree of healing before May 29, 1961, when X-rays were taken. The family pediatrician gave the child an examination on May 18 and noted only a few scratches and minor bruises which he attributed to inexperienced handling of the new baby. He also saw the child two days after birth. He discovered no abnormalities at that time. She appeared normal.

Defendant and his wife, Mrs. Dorothy Luporini, told substantially the same story at the trial concerning the evening of May 28, 1961, when the child's critical condition was first discovered. This was a Sunday, and the parents had been alone with the child in their apartment for the entire day.

They stated that until the evening of that day the child appeared to be in a normal physical condition. Certain blue bruise marks she had on her face and body from birth had disappeared, excepting one more recent blue mark under the right eye which was noticeable. At approximately 5 p. m. the child began to cry, and Mrs. Luporini and defendant entered the child's room together. Mrs. Luporini then went into a bathroom adjoining the child's room to draw a small tub of water for the child's bath. While Mrs. Luporini was in the bathroom defendant picked the child up from her crib, and as he picked her up in his arms the baby's body went ''limp.'' Defendant called his wife from the bathroom, and when she saw the child's condition she became quite hysterical. Defendant immediately proceeded to render artificial respiration to the child which he continued until the child's breathing, heartbeat and coloring appeared normal.

The parents kept watch over the child until about midnight when defendant took the child's temperature which according to his reading of the thermometer was around 102 degrees. Defendant told his wife that he believed the high temperature was a normal reaction to the ''crisis'' which the child had been through, and they agreed to wait for further developments before calling a doctor. The wife stated her husband was up a couple of times during the night to look after the child; that she stayed in bed. Around 7 a. m. the parents uncovered the child and then noticed that her body was very tense with both of her hands clenched tightly. Defendant left for work instructing his wife to call a doctor. Defendant's wife called the doctor at 8 a. m. The child had a fever of 101 degrees at that time. She got an appointment with the doctor for 10:30. Defendant returned home to take the baby and his wife to the family pediatrician. After a cursory examination by the doctor, in which he noted the child to be in an unconscious state with its eyes fixed and staring, he ordered the child taken directly to the hospital.

On May 31 and June 1, 1961, defendant was interrogated by two investigating police officers. The testimony of the police officers concerning the information elicited at the interrogation conforms substantially to the direct testimony of defendant and Mrs. Luporini in reference to the events of May 28 and 29, 1961. However, statements by the defendant gave added details. Defendant told the officers that when he first picked up the child on May 28 it appeared to be in shock; that he could not detect a heart beat and the child appeared to

be not breathing; that when his wife asked him what was wrong with the baby he stated there was nothing wrong except the child appeared a little sick; that he stated this to his wife because she was extremely excitable and he did not want to excite her; that he did not call the doctor because he felt it would kill the child to move her; that the baby was apparently in shock, the eyes were wide open and staring and the child was whimpering and there was a low crying, moaning type of noise coming from the baby; that they placed the child back in the crib, watched television, had something to eat, returning every half hour to check the baby, and retired at midnight; that thereafter the baby's temperature was 103½ degrees and at 3 a. m. it was 104 degrees; that when he arose at 7 a. m. he noted the baby's hand was stiff and he and his wife agreed she would call the doctor.

During the interrogation defendant was asked if he could explain the reason for the child's injuries. He replied that "he must have done it because his wife was very gentle with the baby." Defendant denied ever intentionally or knowingly injuring the child. He further related that his wife had scolded him on several occasions for being too rough with the baby when he picked her up; that he had on several occasions picked up the baby by the body, by the ribs around the chest area. Police informed him that the baby had approximately 20 fractures of the rib cage area; he stated to them that he felt that perhaps he was too strong and possibly when he picked up the baby he could have caused the injuries; when asked if he could explain any reason for the chip fractures to the legs of the baby he told them that he recalled that he had picked up the baby on two occasions by the feet, lower legs, holding the baby with the head down; he then stated that if the legs were fractured, he must have done it because his wife was very gentle with the baby. Defendant further stated he did not know why the baby had a head injury or brain damage and that if the child had such injuries or brain damage he must have caused them. He further stated to the police that he had never accidentally dropped the baby or intentionally struck her head; however, that he possibly had struck the baby's head on the side of the crib when he had picked her up on one occasion, but if there had been head or brain damage he must have caused it unintentionally. He denied noting any discoloration on the baby's face on the evening of May 28, 1961.

At the trial defendant testified that after having had time to think the matter over he believed his wife might have injured

the child accidentally by negligent handling. Mrs. Luporini testified that she herself was subject to severe pain seizures in her spine dating from the birth of the child and that every day when feeding the child she felt she had squeezed it too hard; she reasoned that this was what had injured the child's ribs; the baby would not cry on those occasions and would continue feeding. In answer to the question "How do you know this was too tight?" she testified, "Because something happened to the child, and that's the only way it would happen." She stated she never saw the father mishandle the baby at any time.

On one occasion about two weeks before the child was taken to the hospital Mrs. Luporini stated she slipped and the baby hit the side of her head on the crib.

The mother became pregnant by defendant at a time when they were unmarried. The marriage took place two and a half months prior to the baby's birth. Mrs. Luporini's mother lived near the family and was a daily visitor at the house. These three adults were the only persons known to have ready access to the child.

Defendant's contention on appeal is that the evidence is not sufficient to sustain his conviction for violation of section 245 of the Penal Code, assault by means of force likely to produce great bodily injury. ▮ In order to sustain a criminal conviction, there must be some substantial evidence which would warrant findings of fact, first, that the crime has been committed; and second, that it was committed by the person charged. (*People* v. *Williams,* 151 Cal.App.2d 173, 176 [311 P.2d 117].) Defendant concedes there was substantial evidence to warrant a finding as to the first element, that the crime was committed by someone. Defendant contends, however, that substantial evidence was lacking which would warrant a finding as to the second element, that defendant was the person who committed the crime. The medical testimony establishes that the injuries to the child were not inflicted upon one occasion alone but must have taken place on at least two separate occasions.

▮ The trial court, sitting as the trier of fact, was free to disbelieve and reject the stories related by defendant and his wife concerning the events surrounding the discovery of the child's injuries and their respective rationalizations as to how the injuries occurred. We hold that there was substantial evidence presented at the trial, direct and circumstantial, which supports a finding of defendant's guilt.

In addition to the admissions of the defendant that his own handling of the child might well have caused the injuries there is also other evidence which goes to the inference of guilt. A reasonable inference could properly have been drawn by the trial court that he had seriously injured the baby and was afraid to summon medical aid whereby his crime would be discovered, possibly hoping that the child would recover from her critical state without the necessity of calling in a doctor. In fact, it is exceedingly difficult to rationalize any other explanation of the defendant's failure to seek competent medical aid at a time when by his own statements to the police he feared that even to move the child might cause her death. The steadily mounting temperature of the child to 104 degrees at 3 a. m., and with no medication whatever being administered or aid sought, certainly displayed a callousness that is difficult to explain excepting upon a desire to conceal physical abuse of the child.

Upon first discovery of the child's critical condition on the evening of May 28, defendant stated to his wife, "Do not excite me, too, because if we both lose our minds, we are going to hurt the baby more." The trial court could have construed this statement as an admission that they had hurt the child initially.

A further factor which the trial court no doubt considered in reaching its conclusion was the manner in which the defendant testified. A reading of the record indicates that he appeared to be very evasive and extremely forgetful with respect to some of the statements which he allegedly made to the investigating officer. This was in contrast to his very positive recollections as to other statements.

 We must assume, in support of the judgment, the existence of every fact which the trial court could have reasonably deduced from the evidence and then determine whether the facts justify the inference of guilt. (*People* v. *Deysher*, 2 Cal.2d 141, 149 [40 P.2d 259].) Applying this rule to the record in the instant case leads to the conclusion that there was substantial evidence presented at the trial, direct and circumstantial, which will support the finding of defendant's guilt.

 Certain purported newly discovered evidence was presented upon the motion for new trial which was not in affidavit form. It consisted mostly of written statements by the wife made subsequent to the conviction of her husband whereby the former stresses her own responsibility and seeks to shift it from

the shoulders of her husband. A careful review of these statements adds nothing substantial to that which was before the trial court at the time that defendant's wife testified. The motion for new trial was properly denied.

The judgment of conviction is affirmed.

Burke, P. J., and Balthis, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 2, 1962. Peters, J., was of the opinion that the petition should be granted.